Argued January 12, reversed and remanded March 30, petition
for rehearing denied May 11, 1955

## GILBERTSON ET AL. *v.* CULINARY ALLIANCE AND BARTENDERS' UNION ET AL.

282 P. 2d 632

328

*William J. Masters* argued the cause for appellants Julius and Carmen A. Gilbertson.

*Harold W. Adams,* Assistant Attorney General, Salem, argued the cause for appellant Fred G. Scherer.

*Donald S. Richardson* argued the cause for respondents.

**LUSK, J.**

We have before us in this case questions of the interpretation, application and constitutionality of an act passed by the 1953 legislative assembly governing certain aspects of labor-management relations (Oregon Laws 1953, ch 723, ORS 662.610–662.790).

The act provides for the appointment of a labor examiner with authority to issue a complaint on a charge that a person is engaged in conduct made unlawful by the Act, to hold a hearing upon such charge, and, if he finds that the charge is sustained, to issue an order requiring such person to cease and desist from the unlawful action. The examiner or any interested person may petition the Circuit Court to require the enforcement of such an order, and the court is authorized to enter a decree of enforcement. An appeal to this court from the Circuit Court's decree is provided for.

The present proceeding involves alleged unlawful picketing. The proceeding was commenced by the filing of charges with the labor examiner by an employer, Julius Gilbertson and Carmen H. Gilbertson, dba Paul Bunyan Burgers, Eugene, Oregon (hereinafter referred to as Burgers), against Culinary Alliance and Bartenders' Union, Local No. 643, A. F. of L. (hereinafter referred to as the Union) of unlawful acts in particulars to be hereinafter stated. A hearing by the examiner was had at which both parties were represented by counsel, and which resulted in findings by the examiner sustaining one of the charges and an order commanding the Union to cease and desist from picketing the employer.

Burgers thereafter filed a petition in the Circuit Court for Lane County for enforcement of the order. The court permitted other labor organizations and their officers to intervene on the side of the defendant Union, and permitted the labor examiner to intervene on the side of the petitioner. The case was submitted on demurrers to the petition, based principally on the claim that the 1953 statute is unconstitutional. The court sustained the demurrers and entered a decree dismissing the petition and the labor examiner's complaint in intervention. From that decree Burgers and the labor examiner have appealed.

At this point it is desirable to state the pertinent provisions of Oregon Laws 1953, ch 723. We will refer to the section numbers of the law both as they appear in ORS and in the session laws for 1953. The act is entitled

"Relating to labor and management relations; regulating picketing; providing remedies; creating an agency for the administration of this Act; and repealing chapter 355, Oregon Laws 1947."

662.610 (§ 1) consists of definitions.

662.620 (§ 2): "Except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment, employes shall have the right to select or reject labor organizations seeking or claiming to represent them in bargaining collectively with their employers concerning wages, hours and other terms and conditions of employment, as provided in this Act."

662.700 (§ 10) establishes as a state agency a Division of Labor Elections under the supervision and control of a labor examiner.

662.630 (§ 3): "Whenever any labor organization which has not within the last preceding twelve-month period been recognized or certified as the bargaining agent of an appropriate bargaining unit

claims to represent a majority of the employes in such appropriate bargaining unit for the purpose of collective bargaining and in writing serves notice of such claim on the employer, the employer, or any of his or its employes, or a labor organization may petition, in writing, the examiner to hold an election by secret ballot at an appropriate place to determine whether or not the employes desire to be represented by a labor organization. Such petition shall be filed with the examiner. If he determines the unit is appropriate he shall proceed forthwith to cause an election to be held by secret ballot of the employes in the unit. If the appropriateness of the unit as set forth in the petition is disputed by an interested person the examiner shall determine the appropriate unit after notice and hearing. Employes in the appropriate unit shall be eligible to vote at said election. A majority vote of those voting in the unit shall determine whether or not a labor organization has been designated a bargaining agent. The examiner shall certify that such appropriate unit either has or has not selected a representative for collective bargaining according to the results of the election, and shall notify interested parties. No election shall be directed by the examiner in any bargaining unit or any subdivision thereof within which during the preceding twelve-month period a valid election has been held."

662.640 (§ 4) is an administrative provision relative to the examiner's determination of the appropriate bargaining unit. 662.650–662.690 (§§ 5–9) are all administrative and procedural provisions relative to hearings before the examiner, as is 662.710 (§ 12). Section 12 authorizes the examiner to issue and serve a complaint upon charges that a person has or is engaged in action declared to be unlawful by the Act and to conduct a hearing thereon. We quote subdivision 2 of § 12:

"A transcript of the testimony taken by the examiner shall be made and filed in the office of the

examiner. Thereafter, in his discretion, the examiner upon notice may take further testimony or hear argument. If upon the preponderance of the testimony taken the examiner is of the opinion that any person named in the complaint has engaged in or is engaging in any action declared to be unlawful by this Act, the examiner shall state his findings of fact, serve a copy of the same on the interested persons and issue and cause to be served on the person named in the complaint an order declaring such election invalid or requiring such person to cease and desist the unlawful action, or both. In the event the election is declared invalid the examiner shall cause another election to be held. If upon the preponderance of the testimony taken the examiner is not of the opinion that the person named in the complaint has engaged in or is engaging in any action declared to be unlawful by this Act, the examiner shall state his findings of fact, serve a copy of the same on the interested persons and issue and cause to be served on the person making the charge an order dismissing the complaint.''

662.720 (§ 13) grants a review by the Circuit Court to any person aggrieved by a final order of the examiner and prescribe the procedure therefor. It provides that ''the aggrieved party shall file in the court a transcript of the entire record of the hearing before the examiner, including the pleadings and testimony upon which the order of the examiner was entered'', and empowers the court ''to make and enter upon the pleadings, testimony and proceedings set forth in such transcript a decree enforcing, modifying and enforcing as so modified, or setting aside the order of the examiner. No objection that has not been urged before the examiner shall be considered by the court. The findings of the examiner with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. The jurisdiction of the court shall be exclusive and its decree

shall be final except that the same shall be subject to review on appeal as in the case of any other appealable decree.''

662.730 (§ 14): ''The examiner or any interested person may petition the circuit court of the county in which a hearing has been held to require the enforcement of any order of the examiner made in connection with such hearing. Excepting for the time of filing, the proceedings thereunder shall conform to those set forth in ORS 662.720 and the court shall have authority to make any appropriate order or decree in addition to those therein set forth. The orders or decrees of the court shall be final, except that the same shall be subject to review on appeal as in the case of any other appealable order or decree.''

662.750 (§ 16): ''It shall be unlawful for any person directly or indirectly to compel, intimidate, coerce or discriminate against any employe in the exercise of said employe's free choice in selecting or rejecting a labor organization as the representative of employes for the purpose of collective bargaining, or directly or indirectly to compel, intimidate or coerce any employer or employe because employes of said employer, or of any other employer, have not selected a labor organization as their representative for said purpose. The word 'coerce' includes picketing. Without limiting the foregoing unlawful acts, picketing for the purpose of compelling, intimidating, coercing or influencing an employe of any employer to join a labor organization shall be a violation of this section.''

662.760 (§ 19): ''Nothing contained in ORS 662.610 to 662.790 shall preclude an employer from making an agreement with a labor organization requiring membership therein as a condition of employment.''

662.770 (§ 17): ''It shall be unlawful for any person to picket any employe or employer unless such person has been certified or is recognized as the bargaining representative of such employe or of an appropriate unit of employes of such employer

under the provisions of federal law or the provisions of ORS 662.610 to 662.790.''

662.780 (§ 18): ''(1) Courts of competent jurisdiction shall have power to enforce the provisions of ORS 662.610 to 662.790 by appropriate order or decree. Such proceeding shall be given precedence over all other civil cases. No relief under ORS 662.610 to 662.790 shall be given by any court except after hearing the testimony of witnesses in open court, with opportunity for cross examination, in support of the allegations of a complaint or petition made under oath, and testimony in opposition thereto, if offered. Such hearing shall be held after due and personal notice thereof has been given, in such manner as the court directs, to all persons against whom relief is sought. (2) The orders or decree of the court shall be final, except that the same shall be subject to review on appeal as in the case of any other appealable order or decree.''

662.790 (§ 20): ''ORS 662.010 to 662.130 shall not be applicable to proceedings brought under ORS 662.610 to 662.790.''

The sections of ORS referred to as not applicable to proceedings brought under the 1953 law comprise the so-called Oregon Norris-La Guardia or Anti-Injunction Act.

*Claim of Inconsistency in Procedural Provisions*

It is suggested that the Act is unenforcible because of a conflict between the provisions of §§ 13 and 14, on the one hand, and § 18 on the other. Where judicial review of an order of the examiner is sought by an aggrieved person, or where the examiner or an interested person petitions the Circuit Court for enforcement of such an order pursuant to §§ 13 and 14, the hearing in the Circuit Court is upon the transcript of the proceedings before the examiner. The court is authorized to enter its decree ''upon the pleadings, testimony and proceedings set forth in such transscript'' (§ 13). Further, ''No objection that has not

been urged before the examiner shall be considered by the court. The findings of the examiner with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive.'' But § 18 empowers courts of competent jurisdiction to enforce the provisions of the Act and then provides: ''No relief under ORS 662.610 to 662.790 shall be given by any court except after hearing the testimony of witnesses in open court, with opportunity for cross examination, in support of the allegations of a complaint or petition made under oath, and testimony in opposition thereto, if offered.'' ''ORS 662.610 to 662.790'' in the foregoing sentence was substituted in the revision for the words ''this Act''. If this prohibition were held to apply to proceedings taken under §§ 13 and 14 there would result a clear and irreconcilable conflict, for obviously, on that assumption, a court could not follow the procedure outlined in §§ 13 and 14 without violating the command of § 18.

The legislative history is of interest. The measure was introduced as House Bill No. 663 on March 20, 1953. As passed by the House, the bill contained no provision for the creation of the office of labor examiner and no administrative provisions whatever except that the State Board of Conciliation was invested with authority to conduct elections for the purpose of determining a bargaining agent for employees. Section 7 of the bill provided that any person aggrieved by a violation of any of the terms of the Act should be entitled to injunctive relief and to recover damages resulting from such violation in any court of general jurisdiction. All the provisions for administrative proceedings to be conducted by a labor examiner and for judicial review and judicial enforcement of his orders, as well as the present § 18, came into the statute by Senate amendments which were adopted on April

20, 1953. On April 21 the bill was finally passed. On April 21 the legislature adjourned. In view of this history the following quotation from *State v. Mulhern*, 74 Oh St 363, 78 NE 507, is peculiarly pertinent:

"* * * We are therefore remitted to an ascertainment of the policy and intent of the Legislature by a construction of the entire act. This situation, which presents two irreconcilable provisions respecting the time when the commissioner will take office, probably arose from the undue haste which characterized much of the late work of the session, and appears, as was stated by counsel at the oral hearing, to be a case of too many cooks. Such legislation is sometimes held wholly inoperative, and were the subject-matter of minor interest we would be disposed to hold in this case that the number of cooks had spoiled the broth utterly. But it is not a matter of minor interest but of general interest reaching as it does to every county of the state, and affecting vitally the conduct of each county's business, and it undoubtedly is the duty of the court to endeavor to give effect to the act in one way or the other. Which construction, therefore, will more nearly effectuate the purpose intended, and which will be freest from objection in the practical working out of the law?"

■ There is a rule that in case of irreconcilable conflict between various provisions the last provision in order of position or arrangement in the statute should prevail. The rule was recognized by this court in *Upham v. Bramwell*, 105 Or 597, 619, 620, 209 P 100, 210 P 706, 25 ALR 919, but was not applied because the court was able to harmonize two apparently repugnant provisions of the statute in question. In fact, although many courts recognize the existence of such a rule, an examination of the cases indicates that it is applied only as a last resort. As stated in 82 CJS 719, Statutes § 347.

"* * * However, this rule has been criticized as having no satisfactory basis and as not be-

ing supported by any sound legislative practice. This is a purely arbitrary and artificial rule of construction to which there are exceptions. So, it is subject to the rule that the statute must be construed as a whole to find the legislative intent, and has no application where the prior section or provision is more in harmony with the general purpose or intent of the act, or is clearer and more explicit that the later one, or where the literal interpretation of the later section would nullify the whole act, and is to be resorted to only when there is clearly an irreconcilable conflict, when there are no other means of ascertaining the legislative intent, and all other means of interpretation have been exhausted, and in extremis.''

See, also, Black on Interpretation of Laws, pp. 326, 327. The rule is not applied when the earlier provision of a statute conforms to the obvious policy and intent of the legislature. *Black, op. cit.,* supra; *State v. Mulhern,* supra; *State v. Bates,* 96 Minn 110, 104 NW 709; *Valley National Bank of Phoenix v. Apache County,* 57 Ariz 459, 114 P2d 883; *Western Beverage Co. v. Hansen,* 98 Utah 332, 96 P 2d 1105. As stated by Mr. Black, ''it is only when the subsequent clause combines equal clearness with the advantage of position that it will control the former.'' See, *State ex rel v. Public Service Commission,* 101 Wash 601, 172 P 890.

■■ We are not, however, compelled to resort to use of a rule, everywhere considered arbitrary and unsatisfactory, for the solution of the present question; for we think that while the provisions under consideration are apparently irreconcilable, they are not actually and necessarily so, and that under settled rules of statutory interpretation they may be harmonized. That it is the court's duty to harmonize them, if possible, there can be no doubt. *Lommasson v. School Dist. No. 1,* 201 Or 71, 267 P2d 1105. ''An author must be supposed to be consistent with himself; and, therefore, if in one

place he has expressed his mind clearly, it ought to be presumed that he is still of the same mind in another place, unless it clearly appears that he had changed it." Endlich, Interpretation of Statutes, 250, § 182. And in a case of conflict between the provisions of a statute those susceptible of only one meaning will control those susceptible of two meanings if the statute can thereby be made harmonius. 82 CJS 720, Statutes § 347; *People v. Monroney,* 24 Cal2d 638, 150 P2d 888.

The provisions of §§ 13 and 14 are clear, definite and explicit. They appear to have been modeled upon certain sections of the New York State Labor Act (McKinney's Consolidated Laws of New York, Book 30, Art. 20, § 707)—in many particulars at least the language is identical with that of the New York Act—and they were obviously intended to create a typical modern scheme of judicial review and judicial enforcement of administrative orders. See, also, National Labor Relations Act, 29 USCA § 160 (e). There can be no doubt whatever about the object of these provisions nor the method adopted for the accomplishment of that object. Were it to be held that § 18, by reason of its local position, should prevail over the earlier sections, not only would these detailed, carefully drawn provisions be swept away, but the provisions for administrative hearings and orders would follow in their train, for it is not to be supposed that the legislature would have established these administrative procedures in the absence of appropriate methods for securing judicial review and enforcement.

■ On the other hand, it cannot be denied that the legislature by § 18 has authorized proceedings in court for enforcing and obtaining relief under the Act quite apart from proceedings initiated by the examiner. This, it may be said, is an incongruous provision in such a statute. Nothing in the present case, however,

makes it either necessary or desirable to attempt to determine the appropriate occasions for invoking this initial jurisdiction of the courts rather than proceeding first through the examiner. It is enough to say that there is no necessary inconsistency in the law because it provides for alternative procedures; and, though it may be that the two procedures cannot coexist in entire peace and harmony, at least they can coexist.

■■ We come, therefore, to the effect to be given to the sentence in § 18 which declares that no relief shall be given by any court except after hearing the testimony of witnesses in open court, etc. The language is broad enough to include relief granted by a court pursuant to §§ 13 and 14. But its position in the same section which authorizes an original proceeding in the court is some indication that it was intended to apply only to such proceedings. While the words of the sentence are themselves free from ambiguity there is uncertainty, nevertheless, respecting their application. An intent plainly expressed by the words of a statute may be rendered dubious by the context. Endlich, op. cit., p. 7. Such is the case here. In that posture of affairs it is the court's duty to adopt the interpretation which will give effect to the entire statute rather than one which will wreck a substantial and important part of it, and to withhold controlling effect from a provision susceptible of two meanings over other provisions in apparent conflict with it which are susceptible of only one meaning. We hold, therefore, that § 18 does not affect proceedings taken pursuant to §§ 13 and 14.

### Question of Constitutionality of § 17

The petitioner, Burgers, operates a drive-in restaurant in Eugene. The record would indicate that at the time the picketing commenced it had 12 or 13 em-

ployees, consisting of a cook, waitresses and "car hops".

The charges in the complaint issued in this proceeding by the examiner at the instance of Burgers were (1) that the Union intimidated and coerced employees of Burgers in the exercise of their free choice in selecting or rejecting a labor organization for the purpose of collective bargaining by picketing said employees in the place of business of their employer in violation of § 16 of the Act; (2) that the Union picketed Burgers and its employees at the employer's place of business for the purpose of compelling, intimidating, coercing and influencing said employees to join the Union in violation of § 16 of the Act; and (3) that the Union picketed Burgers and its employees notwithstanding it had not been certified or recognized as the bargaining representative of the employees in violation of § 17 of the Act.

It was stipulated on the hearing that the Union had neither been certified or recognized as such bargaining representative.

We take the following from the findings of the examiner:

"Some time during April, 1953, dissatisfaction arose among the employees regarding meals, rest periods, wages and other working conditions. In May, 1953, the employes sought a way in which they could improve these conditions and, upon their own initiative and without solicitation, went to the union office to talk with them about possible assistance. Several of the employes at that time voluntarily applied for union membership.

"When the employer learned that the employes were applying for membership in the union, she was disturbed by that fact. She telephoned some of the employes who were off duty and she talked with others who were on duty, at first to ask them to

indicate their preference for or against union membership. Then the employer indicated that the union members would lose their jobs and some of them were discharged. Various reasons were given for the firing of employes during this time, and at least one of them was talking against the interest of the employer.

"On May 25, 1953, the employer was presented with a copy of a union contract by a representative of the union, but the evidence is that negotiations were not carried on either with a representative of the union or with the Central Labor Council. The union then took direct action by establishing a picket line on June 4, 1953. With one minor exception, the picketing has been peaceful and there is no supporting evidence of violence at any time.

"The purpose of the picketing has been to get the employer to sign a union contract and to have all of the employes became union members. In other words, they wanted a union house. The picketing was also to publicize a labor dispute and to improve wages and working conditions.

"The picketing has substantially affected the employer's business adversely."

It should be observed here that the 1953 Act did not go into effect until July 21, 1953.

All the foregoing findings are supported by substantial evidence. It also appears by uncontradicted evidence that applications for membership in the Union were signed by six of the employees, and that four of these engaged in the picketing at their own request. The copy of the contract presented by the Union representative to the employer provided, among other things, for recognition of the Union as the sole bargaining agency for the employees and for the employment of Union members only.

Under the head of "Application of Section 16" the examiner found:

"Section 16 makes it unlawful for any person, employer or employe to coerce, intimidate or in-

fluence employes to join a labor organization. In this instance, the evidence is not conclusive that there was coercion, influence, or other activity which would be prohibited by Section 16.''

The examiner concluded that the picketing violated § 17 of the Act because it was carried on by a union which had not been certified or recognized as the bargaining representative of the employees and entered a ''cease and desist'' order accordingly.

In the absence of an opinion of the Circuit Court we assume that the ruling which sustained the various demurrers to the petition was based on the ground that § 17 of the Act is unconstitutional.

Section 17 makes it unlawful for ''any person to picket an employe or employer unless such person has been certified or is recognized as the bargaining representative of such employe or of an appropriate unit of employes of such employer under the provisions of federal law or the provisions'' of the Act now under consideration. Section 1 (6) reads, '' 'Person' includes one or more individuals, labor organizations, partnerships, associations, corporations, legal representatives, trustees, trustees in bankruptcy or receivers.'' In view of this definition the effect of the provision is to limit picketing either of an employer or an employee to any labor organization which has been either recognized or certified as such bargaining representative. All other picketing is denounced as unlawful. Here the Union was neither so recognized or certified.

But the Union contends that the provision violates the guarantee of freedom of speech in the First Amendment of the Federal Constitution against abridgment by the United States and similarly secured to all persons by the Fourteenth Amendment against abridgment by a state. *Schneider v. State,* 308 US 147, 84 L ed 155, 60 S Ct 146. *American Federation of Labor v. Bain,* 165

Or 183, 106 P2d 544, 130 ALR 1278, is cited as decisive of the question. In that case we held that a statute, enacted by the people under the initiative, which defined a labor dispute as "only an actual bona fide controversy in which the disputants stand in proximate relation of employer and the majority of his or its employees and which directly concerns matters directly pertaining to wages, hours, or working conditions of the employees of the particular employer directly involved in such controversy", and which made it unlawful to picket in the absence of a labor dispute as so defined (Oregon Laws 1939, ch 2) was unconstitutional under the decisions of the Supreme Court of the United States in *Thornhill v. Alabama,* 310 US 88, 84 L ed 1093, 60 S Ct 736, and *Carlson v. California,* 310 US 106, 84 L ed 1104, 60 S Ct 746, both decided April 22, 1940. In these cases it was held that picketing which takes the form of "publicizing the facts of a labor dispute in a peaceful way through appropriate means, whether by pamphlet, by word of mouth or by banner, must now be regarded as within that liberty of communication which is secured to every person by the Fourteenth Amendment against abridgment by a state" (*Carlson v. California,* supra, 310 US at p. 113), and that a sweeping prohibition of such picketing which does not "aim specifically at evils within the allowable area of State control" offends against the Constitution. *Thornhill v. Alabama,* supra, 310 US at p. 97.

We reasoned in the Bain case that if peaceful picketing is constitutionally protected as against a sweeping legislative prohibition of the kind condemned in the Thornhill and Carlson cases, it is no less so because engaged in by only a minority of the employees of a particular employer. Since then other courts have taken the same view of similar statutes. *Alabama State Federation of Labor v. McAdory,* 246 Ala 1, 18 So2d 810

(1944); *Stapleton v. Mitchell,* 60 F Supp 51 (D. Kan, 1st Div), opinion by Murrah, Circuit Judge (1945); *International Union of Operating Engineers v. Cox,* 148 Tex 42, 219 SW2d 787 (1949).

In *Stapleton v. Mitchell,* supra, a three-judge court held unconstitutional a provision of a Kansas statute which made it unlawful "to participate in any strike, walk-out or cessation of work or continuation thereof without the same being authorized by a majority vote of the employees to be governed thereby", the court saying "it is the inherent prohibitions of the statute standing alone which impose the unconstitutional restraint". The court cited *American Federation of Labor v. Bain,* supra, and decisions from Alabama and Florida invalidating similar statutes. Concerning these decisions the court said, as reported in 60 F Supp at p. 61:

"We are [not] in accord with the Alabama, Florida and Oregon courts in the treatment of their respective enactments, and we think we may assume for the purposes of this case that the Supreme Court of Kansas would follow the Alabama court in the condemnation of those similar sections of the Act which make unlawful any strike, walkout, or cessation of work, unless authorized by a majority of the employees * * *."

We have put brackets around the word "not" for the reason that its presence makes the sentence entirely out of harmony with the decision and the reasoning of the court, and we have the authority of Judge Murrah for saying that this word got into the sentence by someone's error and that the sentence should read "We *are* in accord with the Alabama, Florida and Oregon courts", etc.

In *Edwards v. Commonwealth,* 191 Va 272, 60 SE2d 916 (1950), the court held unconstitutional a statute

which made it unlawful for any person to picket who was not, at the commencement of a strike or immediately prior thereto, a bona fide employee of a business or industry being picketed. In *Pennsylvania Labor Relations Board v. Chester & Delaware Counties Bartenders Local No. 677*, 361 Pa 246, 64 A2d 834, 11 ALR2d 1259 (1949), the court declared unconstitutional a statute which, as construed, "prohibits in broad and general terms the picketing of a place of employment by persons who are not employes of the place of employment." The Virginia and Pennsylvania decisions would seem to be compelled not only by Thornhill and Carlson but also by *A. F. of L. v. Swing*, 312 US 321, 61 S Ct 568, 85 L ed 855 (1941); *Bakery Drivers Local v. Wohl*, 315 US 769, 62 S Ct 816, 86 L ed 1178 (1942); and *Cafeteria Employees v. Angelos*, 320 US 293, 64 S Ct 126, 88 L ed 58 (1943).

In the Swing case the union picketed Swing's beauty parlor in order to "unionize" it. "To enjoin this interference with this business and with the freedom of his workers not to join a union, Swing and his employees" (312 US 323) sought an injunction which was granted in the court below. The decree of that court recited "that this Court and the Supreme Court of this State have held in this case, that, under the law of this State, peaceful picketing or peaceful persuasion are unlawful when conducted by strangers to the employer (i. e., where there is not a proximate relation of employees and employer), and that appellants are entitled in this case to relief by injunction", etc. (312 US 324.) The Supreme Court reversed. The court said that "it would be improper to dispose of the case otherwise than on the face of the decree" (312 US 325). Speaking for the court, Mr. Justice Frankfurter said:

"* * * We are asked to sustain a decree which for purposes of this case asserts as the common

law of a state that there can be no 'peaceful picketing or peaceful persuasion' in relation to any dispute between an employer and a trade union unless the employer's own employees are in controversy with him.

"Such a ban of free communication is inconsistent with the guarantee of freedom of speech. That a state has ample power to regulate the local problems thrown up by modern industry and to preserve the peace is axiomatic. But not even these essential powers are unfettered by the requirements of the Bill of Rights. The scope of the Fourteenth Amendment is not confined by the notion of a particular state regarding the wise limits of an injunction in an industrial dispute, whether those limits be defined by statute or by the judicial organ of the state. A state cannot exclude workingmen from peacefully exercising the right of free communication by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him. The interdependence of economic interest of all engaged in the same industry has become a commonplace. American Steel Foundries v. Tri-City Council, 257 U. S. 184, 209." 312 US at pp. 325, 326.

The Wohl case arose out of picketing by members of a bakery drivers union—truck drivers who were occupied in the distribution of baked goods. The picketing was directed against two persons who bought goods from the bakery and peddled them to retailers. The union's grievance was that the peddlers did not observe union standards. A state court injunction was set aside. The court said that the state courts were concerned only with the question whether there was involved a labor dispute within the meaning of the New York statutes, and assumed that the legality of the injunction followed from a determination that such a dispute was not involved. But the Supreme Court answered:

"* * * Of course that does not follow: one need not be in a 'labor dispute' as defined by state law to

have a right under the Fourteenth Amendment to express a grievance in a labor matter by publication unattended by violence, coercion, or conduct otherwise unlawful or oppressive." 315 US at p. 774.

In *Cafeteria Employees Union v. Angelos,* supra, it appeared that in two cases the lower courts "enjoined petitioners in broad terms from picketing at or near respondents' places of business." Each case involved a cafeteria, the proprietors of which conducted the business without any employees. The purpose of the picketing was to organize the shops. On the authority of *Senn v. Tile Layers Union,* 301 US 468, 81 L ed 1229, 57 S Ct 857, and the Swing and Wohl cases the Supreme Court, by a unanimous decision, reversed the decrees.

We are not concerned here with a statute such as that in Wisconsin, which denounces as an unfair labor practice picketing by employees and those acting in their interest unless a majority in a collective bargaining unit of the employees of an employer, against which the picketing is primarily directed, have voted by secret ballot to call a strike. Wisconsin Statutes 1939, § 111.06. See *Hotel & Restaurant Employees' International Alliance Local No. 122 v. Wisconsin Employment Relations Board,* 236 Wis 329, 294 NW 632, 295 NW 634, affirmed 315 US 437, 86 L ed 946, 62 S Ct 706 (1942). We need not stop to inquire whether such a statute, much narrower in its terms than § 17 of the Oregon Act and carrying the meaning which it appears on its face to have, contravenes constitutional guarantees, for the Wisconsin Supreme Court in its decision in the cited case sustaining a "cease-and-desist order" against picketing as an incident to an unauthorized strike, put its decision upon the ground that the order only banned picketing accompanied by violence. On review, the Supreme Court of the United States rejected the con-

tention of the union that the injunction was against peaceful picketing, saying that the Wisconsin court has, of course, the final say concerning the meaning of a Wisconsin law and the scope of administrative orders made under it, and ''What is before us, therefore, is not the order as an isolated, self-contained writing but the order with the gloss of the Supreme Court of Wisconsin upon it. And that Court has unambiguously rejected the construction upon which the claim of the petitioners (the union) rests.'' 315 US at p. 441. The holding of the Supreme Court was based solely upon the ground ''that the order forbids only violence.'' Id.

Nor do the decisions of the Supreme Court interpreting provisions of the National Labor Relations Act, as amended by the Labor Management Relations Act, commonly known as the Taft-Hartley Act, 29 USCA §§ 151 et seq., support the constitutionality of § 17. See *Garner v. Teamsters Union,* 346 US 485, 98 L ed 228, 74 S Ct 161 (1953); *Local 74 Etc. v. NLRB,* 341 US 707, 95 L ed 1309, 71 S Ct 966 (1951); *International Brotherhood of Electrical Workers v. NLRB,* 341 US 694, 95 L ed 1299, 71 S Ct 954 (1951); *NLRB v. Denver Building & Const. Trades Council,* 341 US 675, 95 L ed 1284, 71 S Ct 943 (1951); *NLRB v. International Rice Mill. Co.,* 341 US 665, 95 L ed 1277, 71 S Ct 961 (1951). While Oregon Laws 1953, ch 723, bears some general resemblance to the federal act, the latter contains no such broad prohibitions of picketing as we find in § 17. Rather, certain specific acts are defined as unfair labor practices, such, for example, as picketing in aid of a secondary boycott or a jurisdictional dispute where a labor organization has been certified as the representative of the employees, and procedures are established for the restraint of such picketing at the instance of the board or its officers. ''* * * the Congress did not throw the door open wide to federal

injunctions against strikes and picketing at the suit of private employers in private litigation, but sanctioned a departure from the terms of the Norris-La Guardia Act only where the National Labor Relations Board, a public agency, was seeking enforcement of one of its orders, or where a party aggrieved by a final order of the Board was seeking review of a Board order." *W. L. Mead Inc. v. Inter. Brotherhood,* 217 F2d 6, 9 (1st Cir) (1954). A summary of the provisions of the federal act will be found in the case just cited, in which it was held that the District Court of the United States had no jurisdiction to enjoin picketing in a strike called after a dispute arose between the parties to a collective bargaining contract concerning the hours of employment, the agent of the union having, it was claimed, in violation of the terms of the contract, refused to submit the dispute to arbitration. As Mr. Justice Jackson said in *Garner v. Teamsters Union,* supra:

> "The detailed prescription of a procedure for restraint of specified types of picketing would seem to imply that other picketing is to be free of other methods and sources of restraint. For the policy of the national Labor Management Relations Act is not to condemn all picketing but only that ascertained by its prescribed processes to fall within its prohibitions. Otherwise, it is implicit in the Act that the public interest is served by freedom of labor to use the weapon of picketing." 346 US at pp. 499, 500.

But, under § 14 of the Oregon Act, not only may proceedings to enforce a cease-and-desist order be brought by an employer—"any interested person"— but the prohibition against picketing applies to "any person", whether an employee or not and regardless of the object of the picketing or the manner in which it is conducted, the only exception being a recognized

or certified bargaining representative of the employer picketed. In either case, therefore, picketing is denounced as unlawful unless carried on by a union which represents a majority of the employees, and therefore the considerations which we felt compelled us to hold the statute involved in the Bain case to be unconstitutional apply with all their force to § 17. The provision "does not aim specifically at evils within the allowable area of state control, but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press." *Thornhill v. Alabama,* supra, 310 US at p. 97. It prohibits all picketing, no matter what the circumstances, by anyone other than an employee of a particular employer. But the Supreme Court of the United States said in the Swing case:

> "* * * A state cannot exclude workingmen from peacefully exercising the right of free communication by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him." 312 US at p. 326.

As in the Thornhill and Carlson cases and *International Union of Operating Engineers v. Cox,* supra, the section must be tested "on its face." So tested it cannot stand.

█ It is argued, however, that under recent decisions of the Supreme Court § 17 may be sustained as a valid exercise of the state's authority. These cases, it may be said, cast new light on the extent of the identification of picketing with the constitutional right to speak freely as opposed to the correlative right of a state, in the exercise of its reserved powers under the federal system, to regulate picketing in the interest of the public welfare. They definitely establish that picketing may be restrained by a state where it is practiced,

even though peacefully, in the pursuit of an objective reasonably deemed by the state to be unlawful, and whether the state policy in that regard be expressed in a statute or judicially declared. This, indeed, has been the law in Oregon both before and since our decision in *American Federation of Labor v. Bain,* supra. *Peters v. Central Labor Council,* 179 Or 1, 169 P2d 870 (1946); *Stone Logging & Contracting Co. v. Inter. Woodworkers,* 171 Or 13, 135 P2d 759 (1943); *Markham & Callow v. Inter. Woodworkers,* 170 Or 517, 135 P2d 727 (1943); *Schwab v. Moving Picture Operators,* 165 Or 602, 109 P2d 600 (1941); *Wallace v. International Ass'n,* 155 Or 652, 63 P2d 1090 (1936); *Starr v. Laundry Union,* 155 Or 634, 63 P2d 1104 (1936).

■ We will review the Supreme Court cases above referred to in connection with our discussion of the question whether, on the record now before us, it should be concluded that there has been a violation of § 16 of the 1953 Act, and, if so, whether that section or any part of it is constitutional. So far as § 17 is concerned, we think that it is enough to repeat that, inasmuch as the prohibition upon picketing in that section is all embracing, no matter how lawful may be the objective, these decisions lend no support to the respondents' contention. Unless we are prepared to assume that all picketing other than that authorized by § 17 must necessarily be in pursuit of an unlawful objective or otherwise draw to itself illegal characteristics, we cannot escape the conclusion that the section is invalid. But such an assumption has no basis either in experience or reason.

*Questions of Severability and Constitutionality of § 16*

Although the examiner rested his order solely upon a violation of § 17, nevertheless it must be determined whether the record presents a question of the violation

of § 16 as charged in the complaint, and, as preliminary to that question, whether the invalidation of § 17 renders the entire act void. The rules in that regard have now been crystallized into a statute. ORS 174.040 (Oregon Laws 1951, ch 314). The statute reads:

"It shall be considered that it is the legislative intent, in the enactment of any statute, that if any part of the statute is held unconstitutional, the remaining parts shall remain in force unless:

"(1) The statute provides otherwise;

"(2) The remaining parts are so essentially and inseparably connected with and dependent upon the unconstitutional part that it is apparent that the remaining parts would not have been enacted without the unconstitutional part; or

"(3) The remaining parts, standing alone, are incomplete and incapable of being executed in accordance with the legislative intent."

■ Substantially, these are the same rules applied by the courts in the absence of statute. *Fullerton v. Lamm,* 177 Or 655, 163 P2d 941, 165 P2d 63, and cases there cited. We are unable to see any necessary interdependence between § 17 and the remainder of the Act. Certainly there is none between §§ 16 and 17 which merely describe certain acts and conduct and denounce them as unlawful. There is no internal evidence and no legislative history which support the notion that the legislature would not have taken measures to curb what were deemed the evils described in § 16 had they known that § 17 would be declared unconstitutional.

■ With respect to the provisions (§§ 3 and 4) under which employees may, in an election, choose a labor organization which shall be the exclusive bargaining representative of all the employees in an appropriate bargaining unit, the question is somewhat more dif-

ficult. These provisions have a close connection, of course, with § 17 since that section would have been, in part at least, meaningless except for the provisions regarding elections. But, while § 17 may be said to be dependent upon §§ 3 and 4 it by no means follows that §§ 3 and 4 are dependent on § 17, or that the former may not serve a useful purpose regardless of the presence or absence of § 17. A method sanctioned by law for determining the claim of a union that it represents a majority of the employees for bargaining purposes, and by which it would be constituted the exclusive bargaining representative, and under which a dispute between two rival unions for such representation might be settled in a peaceful and orderly manner, could well have been deemed by the legislature an end in itself as tending to diminish the occasions for industrial conflict and thus promote the welfare of employers, employees, the unions and the public. The long history of jurisdictional disputes, which "have wasted the substance of both labor and capital and have irritated public opinion" (Jaffe, "In Defense of the Supreme Court's Picketing Doctrine", 41 Mich L Rev 1037, 1055) and the federal and state legislation passed for the purpose of regulating such disputes, by providing for elections under the supervision of a governmental agency to determine representation, attest some of the reasons of public policy behind the provisions in question. See 1 Teller, Labor Disputes and Collective Bargaining §§ 31, 130-133; *Stone Logging Company v. Inter. Woodworkers of America,* 171 Or 13, 135 P2d 759; *Markham & Callow v. Inter. Woodworkers of America,* 170 Or 517, 135 P2d 727; *Florsheim Shoe Store Co. v. Shoe Salesmen's Union,* 288 NY 188, 42 NE2d 480. In the case last cited, which decided that a labor dispute had ended after an election held pursuant to a New York statute had determined which of two rival

unions should be the bargaining representative of the employees, the court said:

> "* * * Such a result is the only conclusion possible in consonance and harmony with the public policy of the State as declared in the Labor Relations Act which was to prevent or bring to an end strikes and other forms of industrial strife and unrest and to encourage and effect industrial peace among employers and employees." (288 NY 197.)

In this view of the object of the statute the following language from 11 Am Jur 845, Constitutional Law § 155, is pertinent:

> "* * * the elimination of even material provisions in a statute as enacted because of their invalidity does not render the remaining valid provisions thereof ineffective if the part upheld constitutes, independently of the invalid portion, a complete law in some reasonable aspect, unless it appears from the act itself that the legislature intended it to be effective only as an entirety and would not have enacted the valid part alone."

Without § 17 we would still have a complete statute which the legislature might reasonably have thought would accomplish a public purpose in the field of labor management relations. We hold, therefore, that it is not necessary to strike down the remainder of the Act because § 17 must be eliminated as unconstitutional.

We recur now to the charges of violations of § 16 in the complaint issued by the examiner. The first charge is that the Union intimidated and coerced employees of Burgers in the exercise of their free choice in selecting or rejecting a labor organization as their representative for the purpose of collective bargaining by picketing the employees in the place of business of the employer. This obviously is intended as a charge of a violation of the first clause of the first sentence of § 16, which makes it "unlawful for any person directly

or indirectly to compel, intimidate, coerce or discriminate against any employe in the exercise of said employe's free choice in selecting or rejecting a labor organization'' etc.

It is argued by the respondents that this provision applies only when an election is pending, and that its purpose is to prevent intimidation, coercion, etc., practiced against employees when they are about to express their choice of bargaining representative through the medium of a ballot in a secret election as provided for in § 3. This construction, we are advised by counsel, was adopted by the examiner in another case arising under this Act and approved by a circuit judge before whom that case came. But we think it is too narrow for the reason that the examiner is only authorized to hold an election when a labor organization claims to represent a majority of employees in a bargaining unit and serves notice of such claim on the employer. Thereafter the employer, or any of his employees or the labor organization, may petition the examiner to hold an election. The choice of the labor organization as a bargaining agent may be made by employees signing applications to join a union (*R. H. White Company v. Murphy,* 310 Mass 510, 519, 38 NE2d 685), as indeed was done by some of the employees in this case. When the union by this method, or by any other method not prohibited, is in a position to make a bona fide claim that it represents a majority of the employees it may then petition the examiner to hold an election, as may the employer and the employees. Thus, the securing of a majority becomes an integral part of the electoral process, and the free choice by the employees of a bargaining representative was intended to be equally protected against coercion or other improper influence before an election is called as during the period when an election is pending.

The second charge of violation of § 16 is that the Union picketed the employer and employees at the former's place of business for the purpose of compelling, intimidating, coercing and influencing the employees to join the Union. This charges a violation of the third sentence of § 16 which reads "Without limiting the foregoing unlawful acts, picketing for the purpose of compelling, intimidating, coercing or influencing an employe of an employer to join a labor organization shall be a violation of this section." The prohibition is broad enough to cover picketing of both employers and employees.

The obvious purpose of all these provisions is to effectuate the policy expressed in § 2 that "employes shall have the right to select or reject labor organizations seeking or claiming to represent them in bargaining collectively with their employers concerning wages, hours and other terms and conditions of employment, as provided in this Act." The exercise of this right is not to be subject to undue restraints by either employer, employee, or labor organization.

■ One purpose of the picketing, as found by the examiner, was "to get the employer to sign a union contract and to have all the employees become union members." There was substantial evidence to support that finding. The examiner also stated that "the evidence is not conclusive that there was coercion, influence or other activity which would be prohibited by § 16." This is not a finding within the meaning of the statute. It is no part of the examiner's duty to find that evidence is not "conclusive". His function is to pass upon the weight of the evidence and to find in accordance with the preponderance thereof. § 12 (2). To say that the evidence on a particular issue is not conclusive is, for purposes of judicial review, to say nothing, for the court has no way of determining from such a statement

what was the judgment of the examiner as to where the preponderance of evidence lies on that question.

But, in our opinion, notwithstanding the examiner's conclusion that the only violation was of § 17, his finding, supported by ample evidence, that one purpose of the picketing was "to get the employer to sign a union contract" is in effect a finding of a violation of the final provision of § 16. Picketing for the purpose of compelling an employer to sign a contract providing that he will employ only members of the union has for one of its purposes the compelling of the nonunion employees to join the union. If the picketing accomplishes its purpose and brings the employer to his knees and he signs the contract, the employees must join the union or lose their jobs. The final sentence of § 16, as we construe it, was intended to apply to just such conduct. The question then arises: Is this a limitation on the right to picket which the legislature may impose without violating the Fourteenth Amendment? We proceed to a consideration of that question in the light of recent decisions of the Supreme Court of the United States not previously reviewed.

*Carpenters and Joiners Union of America v. Ritter's Cafe,* 315 US 722, 86 L ed 1143, 62 S Ct 807 (1942), sustained a Texas injunction against picketing for a closed shop in these circumstances. Ritter entered into a contract for the construction of a building a mile and a half away from the cafe of which he was the proprietor. The contractor employed nonunion labor. The union picketed the cafe, although Ritter had no controversy with his employees. The Texas court held that the picketing was a violation of the state's anti-trust law, and the Supreme Court in affirming said that in "forbidding such conscription of neutrals, in the circumstances of the case before us, Texas represents the prevailing, and probably the unanimous, policy of the

states." This was "but an instance of the power of the State to set the limits of permissible contest open to industrial combatants." "Where, as here, claims on behalf of free speech are met with claims on behalf of the authority of the state to impose reasonable regulations for the protection of the community as a whole, the duty of this Court is plain." As to free speech the court said:

"It is true that by peaceful picketing workingmen communicate their grievances. As a means of communicating the facts of a labor dispute, peaceful picketing may be a phase of the constitutional right of free utterance. But recognition of peaceful picketing as an exercise of free speech does not imply that the states must be without power to confine the sphere of communication to that directly related to the dispute. Restriction of picketing to the area of the industry within which a labor dispute arises leaves open to the disputants other traditional modes of communication. To deny to the states the power to draw this line is to write into the Constitution the notion that every instance of peaceful picketing—anywhere and under any circumstances —is necessarily a phase of the controversy which provoked the picketing. Such a view of the Due Process Clause would compel the states to allow the disputants in a particular industrial episode to conscript neutrals having no relation to either the dispute or the industry in which it arose." (315 US 727, 728.)

In *Giboney v. Empire Storage & Ice Co.*, 336 US 490, 93 L ed 834, 69 S Ct 684 (1949), the initial controversy was between a union whose membership included about 160 of 200 retail ice peddlers who drove their own trucks in selling ice from door to door and the nonunion peddlers. Most of the latter refused to comply with the union's demand to join the union, agreements with the distributors not to sell ice to the and, in order to enforce that demand, the union sought

nonunion peddlers. One distributor refused to enter into such an agreement, and the union picketed it. The Supreme Court sustained a Missouri injunction based on the ground that the purpose of the picketing was to force the distributor to become a party to an unlawful combination in violation of the state's anti-trust law. In answer to the claim that the union's conduct was protected as the exercise of the right of free speech, the court said:

> "It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute. We reject the contention now." (336 US 498.)

*Teamsters Union v. Hanke,* 339 US 470, 94 L ed 995, 70 S Ct 773, 13 ALR2d 631 (1950), sustained an injunction of the state of Washington against picketing to compel owners of businesses, which they conducted without employees, to become union shops. The court said that it was permissible for the state of Washington to determine which should be preferred, "the union or a self-employer in such a situation" (339 US 475). "Washington here concluded", the court said, "that, even though the relief afforded Hanke and Cline [the self-employed persons] entailed restriction upon communication that the unions sought to convey through picketing, it was more important to safeguard the value which the State placed upon self-employers, leaving all other channels of communication open to the union" (339 US 477). With that determination the court refused to interfere, saying "Mindful as we are that a phase of picketing is communication, we cannot find that Washington has offended the Constitution." *Senn v. Tile Layers Protective Union,* supra (in which appeared the celebrated dictum of Mr. Justice Brandeis which laid the groundwork for the doctrine that pick-

eting is constitutionally protected under some circumstances), was distinguished because in that case the right to picket a self-employed person to compel him to join a union was granted by the law of Wisconsin, whereas Washington law forbade such picketing. The following sentence from the Senn case was quoted: "Whether it was wise for the State to permit the unions to do so [that is, to picket a self-employed person] is a question of its public policy—not our concern" (301 US 481). The court said:

"Here, as in Hughes v. Superior Court * * * we must start with the fact that while picketing has an ingredient of communication it cannot dogmatically be equated with the constitutionally protected freedom of speech. Our decisions reflect recognition that picketing is 'indeed a hybrid.' Freund, On Understanding the Supreme Court 18 (1949). See also Jaffe, In Defense of the Supreme Court's Picketing Doctrine, 41 Mich. L. Rev. 1037 (1943). The effort in the cases has been to strike a balance between the constitutional protection of the element of communication in picketing and 'the power of the State to set the limits of permissible contest open to industrial combatants.' Thornhill v. Alabama, 310 U.S. 88, 104. A State's judgment on striking such a balance is of course subject to the limitations of the Fourteenth Amendment. Embracing as such a judgment does, however, a State's social and economic policies, which in turn depend on knowledge and appraisal of local social and economic factors, such judgment on these matters comes to this Court bearing a weighty title of respect." (339 US 474.)

It was further said:

"Nor does the Fourteenth Amendment require prohibition by Washington also of voluntary acquiescence in the demands of the union in order that it may choose to prohibit the right to secure submission through picketing. In abstaining from interference with such voluntary agreements a State

may rely on self-interest. In any event, it is not for this Court to question a State's judgment in regulating only where an evil seems to it most conspicuous." (339 US 479.)

*Building Service Employees International Union v. Gazzam*, 339 US 532, 94 L ed 1045, 70 S Ct 784 (1950), is another case arising in Washington. It comes close to the question now before us. An injunction was issued enjoining petitioners from "endeavoring to compel plaintiff to coerce his employees to join the defendant union or to designate defendant union as their representative for collective bargaining, by picketing the hotel premises of plaintiff." Plaintiff operated a small hotel in Bremerton, Washington. Representatives of the union called upon him about organizing his employees, and asked him to sign a contract with the union which would require him to require his employees to join the union. The answer of the plaintiff in substance was that he would be willing to sign a contract if the employees wished to join the union. He gave the union representatives permission freely to visit and solicit his employees for membership. In the end the employees refused to join and the plaintiff declined to sign the contract on the ground that that would require him to coerce his employees to join a union contrary to state law. The Washington Supreme Court held that the objective of the picketing was violative of the public policy against the coercion of an employee's choice of bargaining representative, and that the picketing should be enjoined on that narrow ground. The Supreme Court held that such an injunction was not violative of the guarantee of free speech. The court said:

"This Court has said that picketing is in part an exercise of the right of free speech guaranteed by the Federal Constitution. Cafeteria Employees Union v. Angelos, 320 U.S. 293; Bakery & Pastry

Drivers & Helpers Local v. Wohl, 315 U.S. 769; American Federation of Labor v. Swing, 312 U.S. 321; Carlson v. California, 310 U.S. 106; Thornhill v. Alabama, 310 U.S. 88; Senn v. Tile Layers Union, 301 U.S. 468. But since picketing is more than speech and establishes a *locus in quo* that has far more potential for inducing action or nonaction than the message the pickets convey, this Court has not hesitated to uphold a state's restraint of acts and conduct which are an abuse of the right to picket rather than a means of peaceful and truthful publicity." (339 US 536)

The Swing case was distinguished on the ground that in that case "this court struck down the State's restraint of picketing *based solely on the absence of an employer-employee relationship*" (italics added) (339 US 539).

In *Hughes v. Superior Court,* 339 US 460, 94 L ed 985, 70 S Ct 718 (1950), the Supreme Court sustained an injunction against picketing carried on by a group called "Progressive Citizens of America" against the proprietor of a grocery store for the purpose of compelling it to hire negroes as white clerks quit or were transferred until the proportion of negro clerks to white clerks approximated the proportion of negro to white customers. The basis of the decision is found in this sentence of the opinion: "We cannot construe the Due Process Clause as precluding California from securing respect for its policy against involuntary employment on racial lines by prohibiting systematic picketing that would subvert such policy." (339 US 466.)

Concerning picketing as free speech the court said:

"* * * But while picketing is a mode of communication it is inseparably something more and different. Industrial picketing 'is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irre-

spective of the nature of the ideas which are being disseminated.' Mr. Justice Douglas, joined by Black and Murphy, JJ., concurring in Bakery & Pastry Drivers & Helpers Local v. Wohl, 315 U.S. 769, 775, 776. Publication in a newspaper, or by distribution of circulars, may convey the same information or make the same charge as do those patrolling a picket line. But the very purpose of a picket line is to exert influences, and it produces consequences, different from other modes of communication. The loyalties and responses evoked and exacted by picket lines are unlike those flowing from appeals by printed word." (339 US 464-465.)

It was again pointed out that it was not necessary for the state to go all the way and forbid the employer to do voluntarily what the union was restrained from forcing him to do. On this point the court said:

"If because of the compulsive features inherent in picketing, beyond the aspect of mere communication as an appeal to reason, a State chooses to enjoin picketing to secure submission to a demand for employment proportional to the racial origin of the then customers of a business, it need not forbid the employer to adopt such a quota system of his own free will. A State is not required to exercise its intervention on the basis of abstract reasoning. The Constitution commands neither logical symmetry nor exhaustion of a principle." (339 US 468.)

*Local Union No. 10 v. Graham,* 345 US 192, 97 L ed 946, 73 S Ct 585 (1953), involved the Right to Work Statute of the state of Virginia. The policy of the statute as summarized by Virginia's highest court is as follows:

"It provides in substance that neither membership nor non-membership in a labor union shall be made a condition of employment; that a contract limiting employment to union members is against public policy; and that a person denied employment because he is either a member of a union or not a

member of a union shall have a right of action for damages.''

The Virginia court found that an objective of defendants in conducting picketing was to prevent non-union employees from working on the building of a school under a contract with the city of Richmond and issued an injunction. The Supreme Court sustained the injunction, saying:

"Based upon the findings of the trial court, we have a case in which picketing was undertaken and carried on with at least one of its substantial purposes in conflict with the declared policy of Virginia.'' (345 US 201.)

The court answered the argument that the injunction violated the Fourteenth Amendment by citing its recent decisions.

The foregoing decisions all involve directly, and vindicate, the power of the states to regulate picketing for the promotion of the public welfare. In addition, it is now established that a state law which prohibits the denial to any person of an opportunity to obtain or retain employment because he is or is not a member of a labor organization, and forbids employers to enter into contracts or agreements obliging themselves to exclude persons from employment because they are or are not members of a labor organization does not offend against the Fourteenth Amendment by abridging the rights of free speech and assembly. *Lincoln Federal Labor Union v. Northwestern Iron and Metal Co.,* 335 US 525, 93 L ed 212, 69 S Ct 251, 6 ALR2d 473; *American Federation of Labor v. American Sash & Door Company,* 335 US 538, 93 L ed 222, 69 S Ct 258, 6 ALR2d 481. These cases, as will be seen, are not without bearing on the question to be decided here.

We do not stop to inquire whether there have been inconsistencies in the decisions of the Supreme Court

in applying the guarantee of freedom of speech to picketing, or whether later decisions represent a departure from the doctrine of the Thornhill and Carlson cases in the direction of enlarging the allowable area of state control of picketing beyond the limits which those decisions seemed, perhaps, to foreshadow. As to these matters see Jaffe, "In Defense of the Supreme Court's Picketing Doctrine", supra; Newman, The Law of Labor Relations 91-104; *Forkosch,* A Treatise on Labor Law § 198; Teller, "Picketing and Free Speech," 56 Harv L Rev 180; Dodd, "Picketing and Free Speech: A dissent", 56 Harv L Rev 513; Teller, "Picketing and Free Speech: A Reply", 56 Harv L Rev 532.

Regardless of conflicting views of scholars and text writers about these questions, the Supreme Court decisions fully sustain the conclusion of the court in *Stapleton v. Mitchell,* supra, 60 F Supp 61, that "when used as an economic weapon in the field of industrial relations or as coercive technique, speech, press and assembly are subject to reasonable regulation in the public interest and in that respect the state is the primary judge of the need, and it is not required to wait until the danger to the community which it seeks to avoid is 'clear and present'." Compare *American Communications Association v. Douds,* 339 US 382, 393-400, 94 L ed 925, 70 S Ct 674. See, also *Saveall v. Demers,* 322 Mass 70, 74, 76 NE2d 12, 2 ALR2d 1190; *Markham & Callow v. Inter. Woodworkers of America,* supra, 170 Or 578-580. For, like the arguments of an employer directed to his employees, the legend on the banner carried by a picket "may have a force independent of persuasion": Judge Learned Hand in *National Labor Relations Board v. Federbush Co.,* 121 F2d 954, 957.

*Thomas v. Collins,* 323 US 516, 89 L ed 430, 65 S Ct

315, cited by the respondents, is not, when rightly considered, opposed to this conclusion. That case did not involve picketing but the right to make a speech. It was in that context that Mr. Justice Rutledge, who wrote the opinion for the majority, referred to the "clear and present danger" test (323 US 530). And Mr. Justice Douglas, in his concurring opinion, pointed out the distinction, saying, "No one may be required to obtain a license in order to speak. But once he uses the economic power which he has over other men and their jobs to influence their action, he is doing more than exercising the freedom of speech protected by the First Amendment. That is true whether he be an employer or an employee." (323 US 543, 544.) And again in *National Labor Relations Board v. Virginia Electric & Power Co.*, 314 US 469, 477, 86 L ed 348, 62 S Ct 344, where the question related to the alleged unfair practices of an employer, the court, through Mr. Justice Murphy, the author of the Thornhill and Carlson opinions, said "The employer in this case is as free now as ever to take any side it may choose on this controversial issue. But, certainly, conduct, though evidenced in part by speech, may amount, in connection with other circumstances, to coercion within the meaning of the [National Labor Relations] Act. If the total activities of an employer restrain or coerce his employees in their free choice, then those employees are entitled to the protection of the Act." We cannot think that this doctrine, as Mr. Justice Douglas says, is not equally applicable to the "total activities" of a labor organization.

 Since the legislature might have prohibited altogether the execution of a contract between Burgers and the Union, making membership in the Union a condition of employment (*Lincoln Federal Labor Union v. Northwestern Iron and Metal Co., American Federa-*

*tion of Labor v. American Sash & Door Company,* both supra) it follows that it could, without violating the Fourteenth Amendment, prohibit coercion, taking the form of picketing, of the employer and the impact of which would inevitably fall upon the employee to compel the execution of such a contract. The prohibition of picketing having such an object is the exercise of a lesser power than the outright condemnation of closed shop contracts would have been. And the state is under no obligation to outlaw such contracts in order to exercise the lesser power. *Teamsters Union v. Hanke,* supra; *Hughes v. Superior Court,* supra. The legislature has determined that picketing in these circumstances is a substantive evil and should be prohibited. Whether that determination was the part of wisdom it is not for this court to say. At the same time the legislature has guarded the rights of employees by providing a means through a state supervised election to have it legally determined whether a union, claiming to represent the majority of the employees, actually does represent them and is entitled to be their exclusive agent for the purpose of entering into collective bargaining agreements. The legislature has undertaken to protect the employees in the free exercise of the right of selection of a bargaining agent by prohibiting coercion of that choice, whether by an employer, an employee, or anyone else. We are dealing here with the deliberate judgment of the state of Oregon, acting through its legislative branch, on an important phase of the problem of the relationship of labor and management. Such a judgment, the Supreme Court of the United States has said, embracing as it does "a State's social and economic policies, which in turn depend on knowledge and appraisal of local social and economic factors" comes to that court "bearing a weighty title of respect". *Teamsters Union v. Hanke,*

supra. So, likewise, the law comes to this court with a strong presumption of validity, and we are not permitted to declare it void unless invalidity be shown beyond a reasonable doubt. *State v. Anthony,* 179 Or 282, 301, 169 P2d 587.

The most recent pronouncement of the Supreme Court of the United States upon the general subject of that court's conception of its duty and power, when applying the test of the Due Process Clause of the Fourteenth Amendment to state legislation, is the following from the opinion of Mr. Justice Douglas, speaking for a unanimous court, in *Williamson v. Lee Optical of Oklahoma,* 348 US 483:

> "The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought. See Nebbia v. New York, 291 U.S. 502; West Coast Hotel Co. v. Parrish, 300 U.S. 379; Olsen v. Nebraska, 313 U.S. 236; Lincoln Union v. Northwestern Co., 335 U.S. 525; Daniel v. Family Ins. Co., 336 U.S. 220; Day-Brite Lighting, Inc. v. Missouri, 342 U. S. 421. We emphasize again what Chief Justice Waite said in Munn v. Illinois, 94 U.S. 113, 134, 'For protection against abuses by legislatures the people must resort to the polls, not to the courts.' "

■ In view of the holdings of the highest court of the nation that injunctive relief may be granted by a state court against picketing which violates the state's policy with regard to forcing employees to joint a union through the coercive effect of the picketing of employers (the Gazzam and Graham cases), and the other decisions of that court to which we have called attention indicating a large measure of freedom in the states to establish and enforce their own policies with respect

to the regulation of picketing, we cannot say that § 16 of the 1953 Act, and particularly the concluding sentence thereof, is unconstitutional. We hold that the prohibitions of § 16 violate no fundamental rights of the Union. State decisions supporting this view are *Klibanoff v. Tri-Cities Retail Clerks' Union*, 258 Ala 479, 64 So2d 393 (1953), and *Blue Boar Cafeteria Co. v. Hotel & Restaurant Employees & Bartenders Inter. Union*, (Ky) 254 SW2d 335 (1952), 346 US 834, 98 L ed 357, 74 S Ct 41. See, also, Petro, "Recognition and Organizational Picketing in 1952", 3 Labor Law Journal 819; Petro, "Free Speech and Organizational Picketing in 1952", 4 Labor Law Journal 3; Benetar and Isaacs, "The New Trend in Labor Law ", 40 ABA Journal (October 1954) 848; *Wood v. O'Grady*, 307 NY 532, 122 NE 2d 386, 391-393 (dissenting opinion).

## Terms of Decree

It remains to determine what decree should be entered. The power of the court under § 13 of the Act is "to enter a decree enforcing, modifying and enforcing as so modified, or setting aside the order of the examiner." Under § 14 the court is authorized "to make any appropriate order or decree in addition to those" set forth in § 13. Unlike the Labor Management Relations Act, 29 USCA § 160 (c) there is no provision in the Oregon Act for reinstatement of employees in a case where an employer is found to have engaged in an unfair labor practice. The only sanction so far as violation by an employer is concerned would be punishment for contempt in case of refusal to comply with a cease-and-desist order.

As disclosed by the finding of the examiner the employer discharged employees because they joined the Union and threatened to discharge any others who should join. This occurred in May, 1953, before the

Act went into effect. At that time, it would seem, the picketing was protected against judicial restraint by the anti-injunction statute (ORS 662.010-662.130). On July 21, 1953, the Act, pursuant to which this proceeding was commenced, went into effect, and an entirely new situation then emerged. The Union, which claimed to have a majority among the employees, could have called for an election in which the discharged employees would have had the right to vote, for under § 1 (2) an employee "shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any action declared to be unlawful" by the Act. But the employer could not demand an election because the Union had served no written notice that it claimed to represent a majority of the employers (§ 3). And, if the employer was then discriminating against employees because of their union activities, the Union could have filed charges with the examiner and obtained a cease-and-desist order. The Union, however, taking the position that the Act was unconstitutional in its entirety, chose to ignore its provisions, to continue with the picketing, and, when charges were filed against it, to challenge the entire proceeding on constitutional grounds. This, of course, was the Union's privilege. But, as it turns out, the Act is in large part valid, and the Union has been, and, we assume, is still, violating one of its provisions.

Early in July, 1953, Burgers commenced suit in the Circuit Court for Lane County to enjoin the Union from further picketing. While the suit was pending Burgers' attorney offered in writing to settle the controversy by an election under the supervision of the labor commissioner or the labor examiner, when one should be appointed, and by entering into a union security contract with the Union if in such an election it

should be selected by a majority of the employees as their bargaining agent. The offer expressed a willingness that persons employed at the restaurant at a time to be selected by the Union within a week or two preceding May 25, 1953, would be permitted to vote (apparently thus including those discharged for affiliating with the Union), and that the Union might determine whether persons employed since May 25 would likewise be permitted to vote. Burgers further offered to sign such contract as might be agreed upon as a result of negotiations then being carried on between the Eugene Restaurant Association and the Union. The Union rejected the offer for the reason that the employer had announced that under no circumstances would the discharged employees be reinstated, but offered to enter into negotiations with the employer. If it should be suggested that the Act is "one sided" because it fails to include a provision under which the examiner could order reinstatement of employees discharged in violation of § 16, that would not be a ground for the court to refuse to enforce a cease-and-desist order otherwise unobjectionable. *American Federation of Labor v. American Sash & Door Company*, supra, 335 US 540-543; *National Labor Relations Board v. Jones & Laughlin Steel Corp.*, 301 US 1, 81 L ed 893, 57 S Ct 615, 108 ALR 1352.

Nor is it a valid objection that the picketing may have been in part for a lawful purpose, since it has been "undertaken and carried on with at least one of its substantial purposes in conflict with the declared policy" of this state. *Local Union No. 10 v. Graham*, supra; *International Brotherhood of Electrical Workers v. NLRB*, supra, 341 US 700; *NLRB v. Denver Building & Const. Trades Council*, supra, 341 US 688-689.

■ It is the conclusion of the court, therefore, that a

decree should be entered reciting that the picketing by the Union of the business premises of the appellant Burgers is in violation of the policy of Oregon as declared in ORS 662.750 (Oregon Laws 1953, ch 723, § 16), and ordering the Union to cease and desist from such picketing.

### Claimed Violations of Oregon Constitution, Article IV, §§ 20 and 22

 We consider finally two remaining grounds upon which respondents assail the validity of the Act. They assert that the title is defective because it does not mention the Oregon Norris-La Guardia Act, the provisions of which, it is stated in § 20, "shall not be applicable" to the 1953 Act, thus, it is claimed, violating Art. IV, § 22 of the state constitution, and that the Act does not comply with Art. IV, § 22, of the constitution because it amends the Norris-La Guardia Act without setting forth and publishing it at full length. We think that these contentions lack merit. The Act repeals certain provisions of the Norris-La Guardia Act by implication. It authorizes injunction against picketing in certain circumstances where the Norris-La Guardia Act forbids them. The repugnance is clear. See *Columbia River-Longview Bridge Co. v. Bellington*, 140 Or 413, 420-421, 13 P2d 1075, and cases there cited. The words of the title, "Relating to labor and management relations; regulating picketing; providing remedies, creating an agency for the administration of this Act", are a sufficiently comprehensive and adequate expression of the subject of the Act. *State ex rel Kahn v. Tazwell*, 125 Or 528, 534, 266 P 238. The title need not be an index to all matters contained in the Act in order to meet the requirements of the constitutional provision. *City of Klamath Falls v. Oregon Liquor Control Commission*, 146 Or 83, 95, 29 P2d 564. Without

§ 20 the Act is complete. Repeals by implication are not prohibited by Art. IV, § 22, and § 20 is mere surplusage. *In re Idleman's Commitment,* 146 Or 13, 21, 27 P2d 305, is decisive of the point.

The decree is reversed, and the cause will be remanded to the Circuit Court for the entry of a decree in conformity with this opinion. No costs or disbursements will be allowed.

TOOZE, J., dissenting.

I cannot concur in the result reached in the majority opinion.

We all agree that section 17 of the original act (ORS 662.770) is unconstitutional and void. That section of the law is apparently an integral part of the very gist of the statute. Being so, it would ordinarily be held that its unconstitutionality affected the entire act, rendering the whole unconstitutional. But the reasoning of the majority opinion convinces me that, despite the unconstitutionality of this section of the statute, the remainder of the act could stand were that the only objection to its constitutionality.

As to section 16 of the act (ORS 662.750), I originally entertained a serious doubt as to its constitutionality. However, the masterful discussion contained in the majority opinion respecting the validity of this section, although not entirely convincing me of that section's constitutionality, has nevertheless, removed most of my original doubt, and what little remains I am willing to resolve in favor of validity.

However, in my opinion, the real objection to the statute,—an objection that cannot be glossed over—lies in the direct and positive inconsistency and contradiction between the provisions of section 18 (ORS 662.780) and those of sections 12, 13, and 14 (ORS 662.710; 662.720; and 662.730), and, in particular, those of sec-

tion 13 (ORS 662.720). I am convinced that this inconsistency renders the entire act unenforceable.

Sections 13 and 14 provide a complete procedure involving violations of sections 16 and 17. A hearing is first held before the examiner. The examiner makes findings of fact, and enters his order in accordance therewith. Judicial review of such order is provided for, but such review is upon the transcript of proceedings before the examiner. No objection not urged before the examiner may be urged before the court on the review, and, most important, the court is bound by the findings of fact made by the examiner if there is any substantial evidence in the record to support them. The court is not permitted to hear additional evidence. The case is not tried de novo. The language used in sections 12, 13, and 14 is plain and unambiguous. It is positive. The intention of the legislature is clearly manifest from the words it employed. In such circumstances, there is no occasion for resort to rules of statutory construction.

And what is said with respect to the language of sections 12, 13, and 14 applies with equal force to that used in section 18.

Section 18, in part, provides: "(1) Courts of competent jurisdiction shall have power to enforce the provisions of ORS 662.610 to 662.790 [which encompasses every section of the act] by appropriate order or decree. Such proceedings shall be given precedence over all other civil cases." Thus far, there is no inconsistency with the provisions of sections 13 and 14. The statute then continues: "*No relief* under ORS 662.610 to 662.790 *shall* be given by *any court* except after hearing the *testimony of witnesses in open court,* with opportunity of cross-examination, in support of the allegations of a complaint or petition made under oath, and testimony in opposition thereto, if offered. * * *." (Italics supplied). There is no ambiguity in those words.

They are positive and mandatory. "No relief" under the act shall be given by "any court" except after hearing the testimony of witnesses in open court, with the opportunity of cross-examination. "Any court" would clearly include the court mentioned in sections 13 and 14. It is perfectly obvious that this provision of section 18 directly conflicts with the provisions of section 13; the two sections are irreconcilable. I recognize the soundness of the rules of construction mentioned in the majority opinion, and frankly concede that it is the duty of the court in all instances to construe a statute as a whole, and if it can reasonably do so, to harmonize provisions which on their face appear to be inconsistent and contradictory. But that does not mean that any court is justified in ignoring plain language used in any part of the statute, and its clear meaning, in its attempt to uphold the statute. It is not the court's function to make good that which is plainly bad. That is purely a legislative function. In this case, by no rule of statutory construction can we reconcile the irreconcilable. To uphold this statute, we must do one of two things: (1) hold that section 18, being the last section of the act, supersedes sections 13 and 14, a rule of construction that is never applied except *in extremis*; or (2) read a part of section 18 entirely out of the act, or amend it by adding thereto conditions not expressed therein.

The majority opinion seems to hold that section 18 simply provides an additional method for enforcing the provisions of the act, but its positive words hereinabove quoted deny that interpretation. Moreover, to so interpret the emphasized portion of section 18, supra, would require reading into the statute conditions and qualifications not appearing therein, and thereby would, in effect, amend that section. That is a matter exclusively for the legislature.

ORS 174.010 provides:

"In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, *not to insert what has been omitted, or to omit what has been inserted;* and where there are several provisions or particulars such construction is, *if possible,* to be adopted as will give effect to all." (Italics supplied.)

I do not disagree with the rules for statutory construction stated in the majority opinion, but I do disagree with their application to the instant statute insofar as its provisions are in conflict. This inconsistency, coupled with the invalidity of section 17, and the somewhat doubtful validity of section 16, renders the entire statute uncertain, indefinite, and unenforceable.

The judgment of the trial court should be affirmed.