Argued May 9, affirmed as modified September 6, 1962

IN THE MATTER OF THE ESTATE OF
JOHN WILHELM HOLMLUND, DECEASED
KANKKONEN *v.* HENDRICKSON ET AL AND
STATE LAND BOARD

374 P. 2d 393

*Robert G. Danielson,* Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief was Robert Y. Thornton, Attorney General, Salem.

*G. A. Heikkila,* Portland, argued the cause and filed a brief for respondents.

Before McAllister, Chief Justice, and Rossman, O'Connell and Goodwin, Justices.

ROSSMAN, J.

This is an appeal by the State of Oregon, acting through the agency of its State Land Board, from a decree of the circuit court which denied the state's petition for an order of escheat of the estate of one

John Wilhelm Holmlund who died intestate in this state September 15, 1952. The deceased had never married and left no one qualified to inherit his estate unless (1) it was his unwed mother and (2) she was living at the time of his death. The deceased's estate has a value of approximately $20,000. The defendants-respondents are Mr. G. A. Heikkila, Consular officer of the Republic of Finland for the State of Oregon and the same individual as administrator of the estate of the mother whose name is Johanna Holmlund. Both mother and son were born in Finland and both came to the United States, but not at the same time. The defendants-respondents contend that the record warrants no finding that the mother did not outlive her son and that since in the year 1952 (the year of the son's death) he and his mother were capable of being heirs of each other, the son did not die without an heir. The trial judge ruled: "this court cannot say that any sufficient evidence has been introduced in this hearing from which this court can determine that Johanna Holmlund is dead."

The state (appellant) claims that the evidence warrants a finding that the mother (Johanna Holmlund) is dead and that she died before her son. Such being its contention, it next says that she did not inherit her son's estate and that since she was the only person who could have qualified as an heir, the circuit court should have entered an order of escheat.

The defendants-respondents argue that the circuit court properly ruled that the evidence failed to warrant a finding that the mother is dead, and that, therefore, she and not the State of Oregon is entitled to the son's estate.

It will be noticed that Mr. Heikkila is the administrator of the mother's estate. No one can be appointed

administrator of the estate of a living person and, therefore, the appointment of Mr. Heikkila was made upon a supposition that the mother was dead. The appointment was made upon the petition of Mr. Heikkila which was accompanied by a copy of an order made by a court in Finland which found that the mother died January 1, 1956. The trial judge, referring to the Finnish decree ruled: "It is obvious from the reading of the Finnish statutes hereinbefore quoted that a clear mistake of fact or law was made by the Court * * *. Therefore the decree of the Finnish Court is void." The defendants do not challenge that ruling. The state, referring to it, says: "The Finnish Court, however, misapplied the law and the lower court properly so ruled."

Hereafter, when we use the words "the deceased" we will mean the son, John Holmlund. He was born May 25, 1896, and, as we have said, was the illegitimate son of Johanna Holmlund whose alleged death is the principal subject of inquiry. The son came to America some years after his mother but at a time undisclosed by the record. He and his mother did not correspond with each other. At the time of his death, September 15, 1952, he was a resident of Clatsop County.

Under the law of Oregon as it existed at the time of John's death in 1952, he and his mother were heirs of each other. Since the collateral kindred of his mother could not inherit directly from his mother's illegitimate issue, they could share in John's estate only if his mother inherited it, and then only to the extent that they had an interest in her estate. Since if Johanna predeceased her son she could obviously not have been his heir, it became important to determine whether she was living at the time of her son's death.

Johanna Holmlund was born October 15, 1872, in Jeppo, Finland. In 1893 she moved to Nykarleby where she was employed as a domestic servant in the home of her uncle, Johan Jacob Enrot. While thus employed she gave birth to her son John. For seven years, during which she apparently continued in her uncle's employ, Johanna kept her son with her. But in 1904, after having left him with the parents of his father, she left Finland for the United States with the intention of seeking employment. About the same time John's father came to the United States, but the evidence does not disclose the year when he came nor where he went. The facts before us do not reveal where Johanna went after she came to this country nor what she did after her arrival in the United States. If she became married or was naturalized, the fact escaped mention by any witness.

Evidence, scant in amount, indicates that Johanna corresponded with her cousin Ester (Enrot) Bergstrom, but how frequently is not shown. A letter received by Mrs. Bergstrom in approximately 1934 was apparently the last word any of Johanna's relatives or friends had from her. The letter was sent from the state of Idaho, and stated that Johanna had become a member of the Seventh-day Adventist faith. Mrs. Bergstrom testified that that letter along with any others which she had received from Johanna have since been lost.

On the basis of these facts the trial court, sitting without a jury, denied both the state's petition for an order of escheat and Mr. Heikkila's petition for a determination that the heirs of Johanna are the present heirs of John, on the grounds that there was insufficient evidence before it to enable it to determine that

Johanna had died. It accordingly decreed that Johanna was the sole heir of John.

The state claims that the denial of its petition for an order of escheat was error. It argues that since Johanna was last heard from in 1934 the presumption that "a person not heard from in seven years is dead," ORS 41.360 (26), operates to eliminate her as a possible heir. Under the presumption, if it was available, she would have died not later than 1941, eleven years before John's death in 1952. If Johanna did not inherit John's estate, it follows that her heirs also are excluded therefrom. The state, in assuming that the presumption operates, urges that since there are no further heirs John's estate must escheat to the Common School Fund.

In defense of the circuit court's decision Mr. Heikkila argues that the evidence brought by the state is not sufficient to raise the presumption of death and that therefore it must be presumed that Johanna survived John and inherited his estate.

In order to prevail the state must overcome two adverse presumptions. One of these is that the decedent left heirs or next of kin capable of inheriting property and that escheats are not favored. *State Land Board v. Gennies*, 204 Or 443, 283 P2d 655 (1955). The other is that "a thing once proved to exist continued as long as is usual with things of that nature." ORS 41.360 (32). The latter authorizes a presumption that when a person is once shown to be alive he continues to be alive until evidence is brought which shows the contrary. *Fink v. Prudential Insurance Co.*, 162 Or 37, 90 P2d 762 (1939). The burden of persuasion therefore rests upon the state to over-

come the presumption of life by furnishing evidence through which an inference of death may be drawn.

To presume that a person is dead is a serious undertaking. The real value of the presumption lies in the degree of certainty which it introduces into situations where persons have not communicated with those who might reasonably expect to hear from them. We quote the following from 2 Chamberlayne on Evidence, p. 1346, sec. 1093:

> "* * * The rights of persons to remarry without criminal consequences in the event that the absent spouse were not dead, the distribution of estates where an owner or life tenant had disappeared and not been heard from could not conveniently be postponed either to await evidence which might never come, or the arrival of the far distant period when the assumption of the continuance of life should be overcome by the mere lapse of time."

The power to invoke the presumption of death is in many cases tantamount to the power to disinherit. It is capable of abuse. To prevent such abuse this court has subjected the presumption to safeguards. One safeguard which is applied in the absence of special circumstances such as, for instance, extreme old age, is that a diligent search and inquiry must precede any presumption that a missing person is dead. Reasons for this requirement are self-evident. This and other safeguards will be developed in greater detail below.

██ The cases reveal that a presumption of death may be raised in any one of four general situations. Perhaps the oldest of these is that of a person whose age, were he alive, would be beyond human expectation or experience. *In re Katz's Estate,* 239 NYS

722, 135 Misc 861 (1930). It is generally agreed that the presumption does not arise on the basis of old age alone, short of one hundred years. 16 Am Jur, p 17, Sec. 13. In *Drummond v. Makaena,* 30 Haw 116 (1927), the court said:

> "* * * There is no presumption of law or of fact that a person who was born ninety years ago and reached maturity is now dead. The only presumption that would apply in such a case as this is the one to the contrary, that since the two men are shown to have been living in 1862 they continue to live thereafter for a reasonable time. * * *"

See also *Matter of Kestel's Estate,* 98 NYS 2d 721, affd 277 App Div 883, 98 NYS 2d 220 (1950); *Watson v. Tindal,* 24 Ga 494, 71 Am D 142 (1858); *Hammond v. Inloes,* 4 Md 138 (1853). In the case at bar Johanna was less than eighty years old when her son died in 1952. In an age when science has greatly extended the individual's life expectancy and when many people live beyond eighty years it is certainly reasonable to assume that Johanna could have survived John. We cannot, on the basis of her age alone, presume that she predeceased him.

■ A second situation in which the presumption of death may arise is where the missing person was exposed to a specific peril at the time he was last heard from. An example of such a case is *In re Estate of Thornburg,* 186 Or 570, 208 P 2d 349 (1949). In that case a land-based aircraft was flown by naval fliers over stretches of ocean, seeking combat with the enemy. During the course of the flight it sent a message to its base that it was entering an area of bad weather. Both the plane and its crew of six were never seen nor heard from again. Two other planes which had been on the same mission returned to the

base the same afternoon. An intensive search of the entire area produced no trace of the missing plane. Thornburg, who had been its co-pilot, had made a practice of writing to his wife daily. The last letter she received from him was dated the day before his plane disappeared. In sanctioning the presumption that Thornburg had died on the day that his plane had disappeared, the court said:

"Presumptions founded on a reasonable probability must prevail against mere possibilities, otherwise the conclusion could never be arrived at that a man was dead until the natural limit of human life has been reached. * * *"

We do not understand the state to contend that in the case at bar Johanna was exposed to a peril at the time she was last heard from. It is clear that this method of raising a presumption of death does not apply in her case.

■ A presumption of death may also be raised by proof of an unexplained absence plus evidence that the character and habits of the missing person are inconsistent with a voluntary absence for the time involved. This doctrine apparently had its origins in the case of *Tisdale v. Connecticut Mutual Life Insurance Co.*, 26 Iowa 170 (1868). A man of exemplary habits, excellent character, fair business prospects and a happy home life disappeared soon after he was seen on a busy street corner in the city of Chicago. His family and friends never heard from him again. In raising a presumption of death, the court said:

"An honored and upright citizen, who, through a long life, has enjoyed the fullest confidence of all who knew him,—prosperous in business and successful in the accumulation of wealth; rich in the affection of wife and children, and attached to their

society; contented in the enjoyment of his possessions, fond of the associations of his friends * * * with no habits or affections contrary to these traits of character—journeys from his home to a distant city and is never afterward heard of. * * * The reasons that the evidence above mentioned raises a presumption of death are obvious; absence from any other cause, being without motive and inconsistent with the very nature of the person, is improbable. * * *"

See also *Arden v. United Artisans,* 124 Or 225, 264 P 373 (1928). No showing of a sudden and unexplained disappearance is made in the case before us.

■■ The fourth general situation in which a person who is known to have been alive may be presumed to be dead is where that person has been neither seen nor heard from in seven years. We have shown that it is this rule which the state seeks to invoke in its effort to establish that Johanna predeceased her son. But before the presumption may be raised by this rule some well recognized prerequisites must be met. It must be shown affirmatively in relation to the missing person that (1) he has been absent from his place of residence or his usual place of abode or resort, (2) the absence is unexplained, (3) there are persons who would have been likely to have heard from him during that period if he was alive, (4) those persons have not heard from him during that period, and (5) a diligent search and all inquiries appropriate to the circumstances have been made. *Fink v. Prudential Insurance Co.,* supra; *Hitz v. Ahlgren,* 170 Ill 60, 48 NE 1068 (1897); 16 Am Jur p. 26, sec 29-33. Also, see generally, 2 Chamberlayne on Evidence, p. 1343 to 1367, sec 1090 to 1109. In the absence of such affirma-

tive proof, the presumption contended for does not arise.

Before one can declare that a person is "missing" he must determine where that person is deemed to be missing from. It would be patently unreasonable to claim that a person is missing merely because he has not been seen at a place which he does not frequent. And it would be equally unsound to maintain that he is missing because he has not been seen by people with whom he does not normally associate. It is with good sense, then, that the courts have declared that the person who is deemed missing must have been absent from his usual place of abode or resort. It is absence from the place where one is accustomed to be which determines whether one is missing and may be presumed to be dead. *United States v. Robertson,* 44 F 2d 317 (9th Cir 1930). His mere absence from a place where his relatives reside, which is not his own residence, is not sufficient to satisfy the condition. *White v. Prudential Insurance Co.,* 193 Minn 263, 258 NW 519 (1935). In the White case the parents of a missing son attempted to recover on insurance policies on his life. During his childhood he had lived with his parents in their home. In 1917 he had enlisted in the army and had seen service in France. Although he had written numerous affectionate letters to his parents while he was in the army, he failed to return to them after his discharge. They subsequently received two postal cards from him—one from Riverside, California, and the other from Yuma, Arizona. He never communicated with his parents again. In an effort to reestablish contact with her son his mother wrote to him at Yuma, but the letter was returned to her undelivered. The court ruled that a presumption of death could not be based upon his absence from

the residence of his parents because that could no longer be considered his residence. His usual place of abode and resort had changed in the intervening years.

In accord with the conclusion of the White case is the following excerpt from *Hitz v. Ahlgren*, 170 Ill 60, 48 NE 1068 (1897):

> "* * * We hold, therefore, that mere absence of a person from a place where his relatives reside, but which is not his own residence, and mere failure on the part of his relatives to receive letters from him for a period of seven years, are not of themselves sufficient to raise a presumption of death. The absence must be from his usual place of abode or resort."

In that case it was sought to invoke the presumption that a person not heard from in seven years is dead in order to establish the death of one John Phalen, owner of certain property situated in the city of Chicago. Phalen apparently was a former resident of that city, but had subsequently resided in New Orleans and St. Louis, working there and at various other places throughout the country. His place of residence at the time of the litigation or immediately prior thereto was unknown. As is indicated by the above excerpt, the court refused to base a presumption of death upon his absence from Chicago since that was no longer his place of residence.

The case at bar presents a situation similar to those reviewed above. Johanna left her residence in Finland for the United States in 1904 in quest of employment. That she arrived in this country appears from the correspondence which her relatives in Finland received from her periodically. Nothing in the

record indicates that she left the United States after her arrival or that she intended to return to Finland. Indeed, the fact that her relatives in her homeland never saw her again coupled with the occasional letters which she sent them from this country indicate that her residency here was uninterrupted. Wherever her domicile may have been in 1934 it is clear that her place of abode and resort, that is, her residence, was in the United States. Finland was not her usual place of abode or resort because that was no longer the place where she was accustomed to be. Nor was she at that time in the habit of associating with the friends and relatives she had left in that country. It follows that her absence from the residence of her relatives in Finland can form no basis for a presumption that Johanna was dead in 1952.

The state attaches great significance to Johanna's failure to communicate with her relatives and neighbors in Finland after 1934. But it does not show that she had any motivating reason to do so. Johanna was born in 1872. Her cousin, Mrs. Bergstrom, to whom she had written prior to 1934, was born twenty-four years later in 1896. Mrs. Bergstrom was less than eight years old when Johanna, 32 years of age, left Finland for America. We concede the possibility that a correspondence regular and intimate may develop between two persons of such marked disparity in age. We also recognize that its cessation thirty years later might arouse misgivings. But experience and reason lead us to assume that it is probable that the exchange of letters between these two persons, if indeed there was an exchange, was infrequent and sporadic. This conclusion finds support in the answers of John Enrot, Mrs. Bergstrom's brother, to the questions propounded

by the state in its letters rogatory. Concerning Johanna, he testified in part as follows:

"Q About what year was she last heard from?

"A I haven't heard from her since she left Finland.

"Q Where was she living at that time?

"A Well, she was living * * * at my home in Finland."

Enrot was three years older than his sister when Johanna left Finland. He apparently resided at the parental home where Johanna had been employed as a servant. Presumably he continued to live with his parents and with his sister for some years after Johanna's departure. Yet he swore that he could recall having heard nothing from her since she left for America. It is conceivable that the receipt of an occasional letter from Johanna by a member of Enrot's family would escape his notice or, with the passage of time, be erased from his memory. But it would be strange for him to be unaware of a regular flow of letters from the distant United States into his home in Finland written by a person with whom he had apparently had intimate daily contact for a number of years. In addition, Mrs. Bergstrom's own ignorance of any details of Johanna's sojourn in the United States makes it highly unlikely that there was regular correspondence between the two women.

Although the state implies that there was a regular exchange of letters between the cousins until 1934, the evidence does not warrant so sweeping a conclusion. It has been established that Johanna wrote her cousin more than once. No showing has been made that her letters were ever answered. If they were, it does not appear how frequently they were exchanged.

Nor has it been shown that when Johanna's letters stopped coming any effort was made to determine why. Each of these factors is vital in determining the significance of the termination of communication and has a bearing on the likelihood that Mrs. Bergstrom would have heard from Johanna during the ensuing years. It is not unusual for correspondence as infrequent and uncertain as this appears to have been to succumb to old age. It is a common occurrence that communications between parties who never have occasion to see one another, and whose interests become increasingly dissimilar, dwindles and eventually terminates by mutual neglect. The burden was the state's to show that there were persons with whom Johanna would have been likely to communicate. It has not done so. Indeed, the evidence produced has led us to the contrary conclusion.

■ Nor do we believe that the state has discharged its burden of diligent search and inquiry. We are unable to discern any system in the inquiries undertaken by the Land Board. We are unenlightened as to why some of Johanna's relatives were questioned and others were not. Nor is it clear why the search was limited to the death records of Idaho, Oregon and California. No explanation has been offered as to why only the death records were checked and not the marriage and birth records. It is certainly not unreasonable to assume that Johanna may have married while in this country and had children. It has been shown that sound reason supports the requirement that a diligent search and inquiry precede a presumption that a missing person is dead. This is not a mere formality to be executed with all of "the enthusiasm with which an impecunious debtor is wont to seek out his outraged and pressing creditor." *In re Katz's*

*Estate,* 239 NYS 722, 135 Misc. 861 (1930). It is necessary to protect the parties who are unaware of the proceedings and thus unable to defend their rights. In certain instances it operates to prevent fraud. Diligent search and inquiry anticipates search and inquiry at such places and sources of information and from such persons as a reasonably prudent person under the same or similar circumstances would deem to be sufficient. *Hefford v. Metropolitan Life Insurance Co.,* 173 Or 353, 144 P 2d 695 (1944). Several avenues left unexplored by the state are suggested in Mr. Heikkila's brief. It cannot be said that under the circumstances a reasonably prudent person would consider any of them unworthy of his attention. A reasonable place to begin looking for information on an immigrant who has disappeared is in the files of the immigration service. This apparently was not done. Nor was inquiry made as to whether Johanna or her son ever applied for naturalization. Evidence indicates that she is a Seventh-day Adventist. An inquiry directed to that organization may have turned up some clues. It is evident that the condition of diligent search and inquiry has not been complied with. And since the prerequisites necessary to raise a presumption of death after seven years' absence have not been satisfied, the circuit court correctly ruled that there was insufficient evidence before it to determine that Johanna predeceased her son.

The state seeks to apply the provisions of ORS 117.550 to the facts before us. That section provides as follows:

"In proceedings under ORS 117.510 to 117.560 the probate court shall not refuse to find who are the heirs or distributees entitled to any estate being administered therein because of the supposed

or possible existence of an unknown or missing
heir or distributee who has failed to appear. at the
time fixed in the order of the court for the hearing
of the petition, unless it affirmatively appears that
such missing or unknown heir or distributee has
been seen or heard from within a period extending
back not more than seven years prior to the death
of the person whose estate is under administra-
tion; nor shall it be presumed without affirmative
proof thereof, that any such missing heir or dis-
tributee left issue;. but the court shall in such a
case presume and adjudge that such heir or dis-
tributee has died without issue prior to the death
of the decedent and shall ascertain the heirs and
order distribution accordingly."

■ The state's interpretation of that section would
disinherit any heir who has not been heard from in
seven years and who consequently has failed to appear
in court at the time the petition for determination of
heirship was to be heard. This result would follow
whether or not an effort had been made to locate such
heir, and regardless of whether he was aware of the
proceedings. It is evident that such a procedure would
be manifestly unfair to the heir concerned. That in-
terpretation of the section would doubtless raise grave
constitutional problems as well. We cannot agree that
the legislature intended such a result. That its in-
tention must have been otherwise will appear upon a
showing that the state's interpretation renders nuga-
tory a related section of the statute.

ORS 120.310 to 120.400 prescribe the procedure
for dealing with estates of persons presumed to be
dead. Section 120.320 of that sequence reads in rele-
vant part as follows:

"The provisions of ORS 120.310 to 120.400 also
apply to a person not heard from in seven years

who was a resident of another state, territory or district of the United States, or of a foreign country at the time he was last heard from or his last whereabouts or residence known, and whose estate at the time of the issuance of letters of administration consists of * * * a distributive share under an order of a probate court or moneys in an estate of a deceased person in the State of Oregon, whose estate has not been closed or settled and is in the course of administration and in the possession of * * * an administrator of an estate. * * *"

The above provisions clearly relate to estates of missing persons which consist of property to be inherited from deceased owners of property located in Oregon. It is an unequivocal recognition that such heirs may inherit regardless of their failure to appear at the proceedings of the probate court. But the interpretation of ORS 117.550 urged by the state would disinherit such heirs. It is in obvious conflict with the above section.

In arriving at the legislative intent in the enactment of a statute, it should be read in connection with all statutes relating to the same subject matter, and effect should be given to every word, phrase, sentence and section of all such statutes, if possible. *State v. Popiel,* 216 Or 140, 337 P 2d 303 (1959). Where there is a conflict between the various provisions of the statute, it is the court's duty to harmonize them if possible. *Gilbertson v. Culinary Alliance et al.,* 204 Or 326, 282 P 2d 632 (1955).

A careful reading of the language of ORS 117.550 discloses that it is confined by its own terms to cases (1) where the court refuses to find who are the heirs because of (2) the "supposed or possible existence" of an unknown or missing heir or distributee. It is a

directive to the probate courts that as long as the existence of an heir or distributee is merely in the realm of conjecture such heirs or distributees shall be presumed to have died intestate prior to the death of the decedent. Such a situation might arise if in the probate of Johanna's estate the court, having no reliable evidence that Johanna ever had children other than John, were to refuse to order distribution among her known heirs because such children might possibly exist. The legislature thought it wise that the probate of an estate not be delayed by mere suspicion or intuition.

■ No such uncertainty exists here. The circuit court sitting in probate has not refused to recognize an heir. This fact alone places the case beyond the scope of the section. Moreover, Johanna is not a person whose existence is no more than "supposed or possible." She has been clearly identified as John's mother and as his heir. No guesswork as to her identity was involved. Under no condition could she turn out to be a fictitious character or a figment of the judge's imagination. This section does not substitute a new rule for presuming the death of an absentee who is known to have existed. Nor does it disinherit missing heirs who have been identified. Clearly, it finds no application to the facts of this case.

In view of the foregoing we conclude that the circuit court did not err in denying the state's petition for an order of escheat.

■ The state also claims, in its second assignment of error, that the circuit court erred in retaining jurisdiction of the cause for the purpose of awarding an attorney fee to Mr. Heikkila for his services in preserving the estate. ORS 120.010 through 120.150 give the circuit court jurisdiction over petitions for escheat,

prescribes the court's procedure and delineates its powers. Those sections of our laws appear to be complete. They do not authorize the court to fix an attorney fee for some one who claims that he preserved the estate. We do not believe that the court can grant that type of relief in cases of this character. Claims for compensation of that kind should be presented to the probate court.

Apart from the modification of the circuit court's decree mentioned in the preceding paragraph, the challenged decree is affirmed.