Argued and submitted January 25, 1993, affirmed January 5, petition for review denied March 22, 1994 (318 Or 478)

## IRON HORSE STAGE LINES, INC.,
an Oregon corporation,
*Appellant,*

*v.*

## PUBLIC UTILITY COMMISSION
## OF OREGON,
*Respondent.*

### (91C-11373; CA A75829)

866 P2d 516

C. Peter Sorenson argued the cause for appellant. With him on the brief were Carl F. Merkle, Jr., and Sorenson Law Office.

Philip Schradle, Assistant Attorney General, argued the cause for respondent. With him on the brief were Charles S. Crookham, Attorney General, and Virginia L. Linder, Solicitor General.

Before Rossman, Presiding Judge, and De Muniz and Leeson, Judges.

LEESON, J.

De Muniz, J., dissenting.

**LEESON, J.**

Plaintiff appeals a circuit court judgment affirming three final orders of defendant Public Utility Commission (PUC). We affirm.

Plaintiff is a common carrier. It holds regular route authority, ORS 767.415(1), to provide bus service from Eugene to the Willamette Pass ski area. In March, 1989, PUC filed formal complaints against Willamette Pass Ski Corporation (Ski Corp) and Berg's Ski Shop of Eugene (Berg's), for acting as a broker without a license, because they provided bus service, known as the Willamette Pass Express (the Express), that duplicated plaintiff's service. As part of the settlement of those proceedings, PUC staff members outlined means by which they believed Ski Corp and Berg's could duplicate plaintiff's regular route bus service without violating applicable laws.

Pursuant to one of those recommendations, Berg's entered into an agreement with Le Traveler's Club, a broker licensed under ORS chapter 767, to act as Le Traveler's agent. Berg's maintains a sign-up sheet at its store and collects money from passengers for bus rides on the Express. Le Traveler's contracts for bus service from motor carriers on an "as needed" basis. Berg's forwards the money it collects to Ski Corp. The motor carriers submit invoices to Le Traveler's, then Le Traveler's submits invoices to Ski Corp for the cost of the buses and a broker's fee.

Based on that arrangement, Ski Corp produced and circulated a tabloid advertisement stating, in part:

> "The Willamette Pass Express will once again be available to solve your transportation needs. The Express will make round trip excursions weekends and holidays through the [1989/90] season."

The advertisement gave the times for departure from and return to Berg's and stated rates for a bus ride only, as well as rates for combined bus and lift tickets. It stated that passengers could sign up at Berg's to reserve a seat on the Express.

Le Traveler's used the services of at least three motor carriers to provide the advertised transportation during the 1989/90 season. Each had authority to provide irregular, but not regular, route service between Eugene and Willamette Pass.

Plaintiff filed complaints with PUC against Ski Corp and Berg's, seeking orders requiring them to cease and desist their activities involving the Express. Plaintiff argued that Ski Corp and Berg's had conspired to provide regular route bus service in violation of ORS chapter 767.

With respect to Ski Corp, PUC said,

> "[W]e cannot conclude that [Ski Corp] violated the motor carrier laws. Although [it] was in a position to profit from the arrangement and advertised the availability of the service * * *, there is no evidence indicating that [Ski Corp] assumed a role in the control, direction, or responsibility for the transportation."

PUC ruled that Berg's is a broker of the services provided by the Express, and that,

> "[a]lthough carriers are prohibited from providing regular route operations without authority * * *, Oregon law does not prohibit brokers of passenger service from arranging transportation in a manner which is equivalent to regular route operations."

PUC concluded that plaintiff had not shown that it was entitled to a cease and desist order against either Ski Corp or Berg's. The circuit court affirmed.

■■ Although this is an appeal from the circuit court, we review the PUC orders. Plaintiff has the burden of showing that PUC's findings are not supported by substantial evidence, that its conclusions are not rationally related to its findings or that its orders are unreasonable or unlawful. *Market Transport v. Maudlin*, 301 Or 727, 734, 725 P2d 914 (1986).

Plaintiff does not challenge PUC's conclusion that Berg's is a broker rather than a carrier and that Ski Corp is neither a broker nor a carrier with respect to the services provided by the Express. Plaintiff argues that the Express provides regular route service, rather than irregular route

charter service.[1] It appears to maintain that the involvement of Ski Corp and Berg's in that service is subject to a cease and desist order on the ground that it violates ORS 767.415.

PUC contends that ORS 767.415 proscribes the conduct of carriers only, and that neither Ski Corp nor Berg's is a carrier with respect to the Express. Therefore, that statute does not proscribe the conduct of, and cannot form the basis for cease and desist orders against, Ski Corp or Berg's, with respect to their activities involving the Express.

ORS 767.415 provides, in part:

"(2) *Regular route carriers of persons shall* file a schedule setting forth the termini between which service is rendered, the hours of departure and arrival, and tariffs and classifications governing rates. * * *

"(3) *Irregular route carriers shall* file tariffs and classifications governing rates. Irregular route common carriers shall serve indiscriminately the territory which they are authorized to serve, and their service shall be on call, coincidental, nonscheduled, unperiodical, itinerant and ambulatory in nature. *Such carriers shall not*:

"(a) By solicitation, advertisement, or by a course of dealing or practice, or otherwise, hold themselves out to render regular service between any particular points or over any particular routes, or lead shippers to believe or understand that they may rely upon a continuous regularity of service by such carriers between particular or specified points or over any particular or specified route.

"* * * * *

"(c) Operate under a predetermined plan of operation or time schedule between any particular points or over any particular route, but this paragraph shall not prohibit repeated movements by such carriers over the same route or between the same points in instances where the character or volume of the traffic requires repeated movements over the same route for such reasonable periods of time as may be

---

[1] An irregular route carrier is authorized to provide charter service. ORS 767.422. ORS 767.005(5) defines "charter service" to mean

"irregular route passenger service under contract with a carrier for exclusive use of the vehicle by a complete, cohesive group that has a common trip purpose."

The dissent asserts obliquely that, because the Express is not a charter service, Berg's has violated the provisions of ORS chapter 767. However, the dissent never identifies which provision of that chapter Berg's has violated.

necessary to meet the needs of a particular shipper in particular instances or requiring specialized service." (Emphasis supplied.)

■ ■    We agree with PUC that ORS 767.415 regulates carriers, and that its prohibitions do not apply to non-carriers. As noted above, plaintiff does not dispute PUC's conclusion that neither Ski Corp nor Berg's is a carrier with respect to the Express and plaintiff does not seek relief against any carrier. Plaintiff offers no other legal basis upon which cease and desist orders against Ski Corp or Berg's could rest. Plaintiff therefore has failed to meet its burden of showing that PUC erred by refusing to grant such an order.

Affirmed.

**De MUNIZ, J.,** dissenting.

The majority concludes that, because ORS 767.415 regulates carriers and neither Berg's nor Ski Corp is a carrier with respect to the Express, there is no basis on which to issue a cease and desist order. However, as PUC states, "[a]rranging * * * charter service is what passenger brokers do," and ORS 767.040 provides that

"[n]o common carrier, contract carrier or private carrier shall operate any motor vehicle for the transportation of persons or property, or both, on any public highway in this state, *and no person shall act as a broker, except in accordance with the provisions of this chapter.*" (Emphasis supplied.)

Berg's is an agent of Le Traveller's, a broker licensed under ORS chapter 767.[1] Accordingly, the arrangement here must comply with the requirements of chapter 767, and whether or not it does depends on whether it is a "charter service" as defined in ORS 767.005(5). The majority opinion does not address that central issue, and, because I conclude that the PUC erroneously interpreted "charter service," I dissent.

---

[1] ORS 767.005(1) defines broker as

"any person not a 'motor carrier' or a bona fide employee or agent of any carrier who sells or offers for sale any transportation subject to this chapter, or negotiates for or purports to be one who sells or arranges for such transportation."

ORS 767.005(5) defines "charter service" to be an

"irregular route passenger service under contract with a carrier for exclusive use of the vehicle by a complete, cohesive group that has a common trip purpose."

In concluding that the arrangement here came within that definition, PUC said:

"[Le Traveler's and Berg's] arranged for transportation services which were provided by carriers holding charter carrier authority from the Commission. The charter groups were comprised of individuals, brought together under the auspices of a licensed broker, who sought to ski or to otherwise use the destination recreational facilities available at the Willamette Pass ski area."

Plaintiff is incorrect in arguing that Berg's was not a charter service, because all the passengers who signed up did not want to use Ski Corp's skiing facilities for skiing activities, and, therefore, there was no common trip purpose. PUC's interpretation, that use of recreational facilities at a destination constitutes a "common trip purpose" even though the recreation might not be identical for each passenger, is within the range of possible interpretations for that term.

However, ORS 767.005(5) requires not only a common trip purpose but also a "complete, cohesive group." Interpretation of a statute requires giving meaning to every phrase, if possible. *Kankkonen v. Hendrickson, et al*, 232 Or 49, 67, 374 P2d 393 (1962). PUC did not address the phrase, apparently concluding that a common trip purpose serves to define the "complete cohesive group." However, the two are not the same.

ORS 767.005(5) was enacted in 1981 as part of Senate Bill 121, in which the legislature provided for a new irregular route passenger service of "special operations."[2] The statement prepared by Robert E. Royer, Assistant Director of the Oregon Department of Transportation, and presented to the Senate Transportation Committee in support of

---

[2] ORS 767.005(19) defines special operations as

"irregular route passenger service that is not charter service or the usual operation of the ordinary regular route common carrier of passengers and involves the sale of tickets by the carrier to the individual passenger."

the bill, explained how special operations would differ from charter service:

> "The concept embodied in Senate Bill 121 is to encourage greater energy efficiency in transportation to special events. For this purpose, special events will typically include sporting and entertainment events. These are events which may be scheduled well in advance and may occur frequently but not on an every day basis.

> "The purpose of Senate Bill 121 is to create a new category of irregular route service within Chapter 767 (regulatory authority of the Public Utility Commissioner). Presently, an irregular route carrier of passengers may be licensed to operate only as a charter service. *In a typical charter operation all the seats on a bus are sold to a single entity as a group*. An individual cannot buy a single seat on a charter bus. In other words, *if a group large enough to charter a bus cannot be brought together under a single umbrella and if regular route service is not available to a special event*, an individual has no public transportation alternative under present law.

> "Senate Bill 121 will define charter service and a new category called 'special operations.' It also allows a carrier to sell tickets on an individual basis while providing the service to a special event." Minutes, Senate Transportation Committee, February 9, 1981 (Exhibit C). (Emphasis supplied.)

That history supports that the "complete, cohesive group" in ORS 767.005(5) must have some identity as an entity apart from the common trip purpose.

ORS 767.010(1)(b) states that one of the policies behind regulation of motor carriers is to "[f]oster sound, economic conditions in transportation." PUC is to regulate operating schedules by regular route carriers, in part to prevent unnecessary duplication of one regular route carrier of the services afforded by other regular route carriers. ORS 767.405(5).[3] The legislative history of ORS 767.005(5) demonstrates that a charter service was not intended to be used as a subterfuge to provide competition for regular route service, without meeting the requirements to be licensed for a regular route. The requirement that a charter service be a group that

---

[3] The hearings officer here concluded that the Express was a regular route service.

not only has a common trip purpose but is also a complete cohesive group, avoids improper use of a charter service.

PUC's order does not correctly interpret the term "charter service," and the majority opinion does not interpret it at all. I dissent.